**David RUIZ, et al., Plaintiffs,**

**United States of America,
Plaintiff-Intervenor,**

**v.**

**O.L. McCOTTER, et al., Defendants.**

**Civ. A. No. H–78–987–CA.**

United States District Court,
S.D. Texas,
Houston Division.

Dec. 31, 1986.

William Bennett Turner, San Francisco, Cal., for plaintiffs.

Dan Jacobs, U.S. Dept. of Justice, Civil Rights, Div., Washington, D.C., for intervenor.

Jim Mattox, Atty. Gen. of Texas, F. Scott McCown, Melinda Hoyle Bozarth, Nancy Juren, Cynthia N. Milne, and Mary Keller, Asst. Attys. Gen., Austin, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

### Introduction

The present phase of the *Ruiz* litigation [1] concerns civil contempt proceedings arising from several of the prison reforms previously ordered in this action. The particular reforms at issue were based upon certain agreements and stipulations of the parties. After hearings pursuant to Fed.R.Civ.P. 23, the agreements and stipulations were each approved by the court, and orders were issued to effectuate them.

By a motion filed January 8, 1986, the plaintiff class of prisoners demanded that the defendants, including defendant O.L. McCotter, Director of the Texas Depart-

1. *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex. 1980), *aff'd in part and vacated in part,* 679 F.2d 1115 (5th Cir.), *amended in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983), now styled

ment of Corrections (TDC),[2] and defendant Alfred D. Hughes, Chairman of the Texas Board of Corrections, be ordered to show cause why they should not be held in contempt for acts or omissions in violation of such court orders. Generally, plaintiffs' claims included TDC's alleged failure to: 1) provide single-occupancy cells ("single-celling") to prisoners requiring such housing; 2) assign housing to prisoners according to their respective custody classifications, so as to preclude the presence of dissimilar classifications in the same housing areas; 3) post correctional officers inside the cellblocks and dormitories; 4) hire health care professionals; 5) furnish to physically handicapped prisoners adequate medical care, living facilities, working conditions, and equal access to prison programs; 6) afford to prisoners in administrative segregation appropriate housing facilities, lighting, shelves, daily showers, out-of-cell recreation, and case-by-case determinations of personal property restrictions;[3] and 7) construct specified recreational facilities. The plaintiffs seek monetary and other relief for TDC's purported violations of the stipulated reforms. A show cause order was entered on March 17, 1986.

TDC filed what was denominated as Defendants' Return to the Show Cause Order on March 28, 1986, and a Supplement to the Return on June 13, 1986. These responses consist of: 1) admissions of noncompliance accompanied by explanations; 2) denials of contempt; and 3) numerous contentions regarding the alleged inappropriateness of the requested relief. Additionally, TDC solicited modification of court orders regarding four areas: cell housing for certain female inmates; staff deployment; scheduling of recreation, property restrictions, and shelf requirements regarding prisoners in administrative segregation; and the con-

struction of recreational facilities conforming to the stipulations of the parties.

The show cause hearing, conducted between June 23 and July 1, 1986, produced nearly 200 exhibits and the testimony of thirty-one witnesses, including several experts and prisoners. In late July, post-hearing and reply briefs were filed, which detailed supporting evidence relevant to the alleged violations and proposed relief.[4]

Because of the grossly unconstitutional conditions extant in TDC at the commencement of this action, the reforms ultimately ordered to correct them were necessarily extensive. *See Ruiz v. Estelle,* 679 F.2d 1115 (5th Cir.1982). But, questions concerning the constitutionality of the Texas prison system are not under consideration at the present juncture; rather, the matters in dispute relate to allegations of contumacy by TDC with respect to specific provisions of prior orders (all issued in conformance with the agreements and stipulations of the parties), and the need, if any, for their modification.

 The judicial sanction of civil contempt is designed to enforce the rights and administer the remedies which a court has found a party entitled to in an order or decree. A sanction may issue only if the relevant court decree is clear and unambiguous, *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *North Shore Laboratories Corp. v. Cohen,* 721 F.2d 514, 521 (5th Cir.1983), the proof is "clear and convincing" (a standard higher than "preponderance" though not commensurate with "beyond a reasonable doubt"), *Neely v. City of Grenada,* 799 F.2d 203, 207 (5th Cir.1986); *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir.1976), and it is established that the violation was

*Ruiz v. McCotter,* pursuant to Fed.R.Civ.P. 25(d)(1).

**2.** The acronym "TDC" hereafter will be employed to refer to all of the defendants, unless the context indicates otherwise.

**3.** "Administrative segregation is a non-punitive status involving separation of an inmate from the general population for the purpose of main-

taining safety, security and order among general population inmates and correctional personnel and within the prison institution." Administrative Segregation Plan, p. 1.

**4.** Although absent from the hearing, the United States, plaintiff-intervenor, submitted a posthearing brief.

occasioned by reason of failures amounting to a want of diligence, ineffective control, and lack of steadfast purpose to effectuate the prescribed goals. *Aspira of New York, Inc. v. Board of Education of City of New York*, 423 F.Supp. 647 (S.D.N.Y.1976). Contempt represents more than a delay in performance or lack of perfection; it is, instead, the failure to accomplish what was ordered in meaningful respects.[5] Moreover, good faith alone is no defense to this charge, since there is no intent requirement in respect of a determination of civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Newman v. Graddick*, 740 F.2d 1513, 1528 (11th Cir.1984).[6]

■ Defendants may defeat a finding of contempt, however, by demonstrating that they employed, in good faith, the utmost diligence in discharging their responsibilities. "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action." *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521, 528 (1983). In such a case, modification of the particular order would be appropriate.

■ The agreements and stipulations under examination amount to consent decrees.[7] Modification of a consent decree that will alleviate or eliminate any condition designed to be affected thereby must be reviewed under the test established in *United States v. Swift & Company*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). "Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" should lead to such a modification. *United States v. Swift & Company*, 286 U.S. at 119, 52 S.Ct. at 464.

> *Swift* teaches that a [consent] decree may be changed upon [such a] showing, and it holds that it may *not* be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree ... have not been fully achieved.

*United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968) (emphasis in original). *See Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986). But the Supreme Court rejected the use of the *Swift* test when modification of the decree would place additional restrictions on a defendant. Thus, when it has been determined that the relief originally

---

**5.** "The word 'contempt' rings fiercely; if its connotation in law included only lay notions like scorn and wilful disobedience, plaintiffs could not prevail. But the idea in this context [*i.e.*, supervising faithful performance of a consent decree] includes failures in meaningful respects to achieve substantial and diligent compliance." *Aspira*, 423 F.Supp. at 649.

**6.** Where noncompliance to an appropriately clear order is found to have been willful beyond a reasonable doubt, a defendant should be held in criminal contempt. *See Powell v. Ward*, 643 F.2d 924 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981).

**7.** "A consent decree is a strange hybrid in the law; it is both a contract that has been negotiated by the parties and a court order which can be altered by a court if circumstances warrant. *Brown v. Neeb*, 644 F.2d 551 (6th Cir.1981). This Court has held that 'since consent decrees and orders have many attributes of ordinary contracts, they should be construed basically as contracts.' *Neeb*, 644 F.2d at 557; *citing United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975).

"The terms of a consent decree, unlike those of a simple contract, however, have unique properties. *See ITT Continental Baking Co.*, 420 U.S. at 236 n. 10, 95 S.Ct. at 934 n. 10. The circumstances surrounding the formation of the decree help determine the purpose for which the decree was entered. *Neeb*, 644 F.2d at 562; *United States v. Bechtel Corp.*, 648 F.2d 660 (9th Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981). The binding substantive commands of a consent decree are embodied within decree's 'four corners.' *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). A decree embodies the legal constraints which govern the behavior of the parties during the life of the decree. *ITT Continental*, 420 U.S. at 236, 95 S.Ct. at 934. If the language of the decree is ambiguous, however, the court's interpretation of its substantive commands may depart from the 'four corners.' *United States v. Motor Vehicle Manufacturers Association*, 643 F.2d 644, 648 (9th Cir.1981)." *Dotson v. U.S. Department of Housing and Urban Development*, 731 F.2d 313, 318 (6th Cir. 1984). *See Berger v. Heckler*, 771 F.2d 1556 (2d Cir.1985).

ordered has not produced the intended results, "the District Court should modify the decree so as to achieve the required result with all appropriate expedition." *United States v. United Shoe Machinery Corp.,* 391 U.S. at 252, 88 S.Ct. at 1501. *See United States v. Lawrence County School District,* 799 F.2d 1031, 1046 (5th Cir.1986); *Neely v. City of Grenada,* 799 F.2d at 211; *Exxon Corporation v. Texas Motor Exchange of Houston,* 628 F.2d 500, 503 (5th Cir.1980).

The findings of fact which follow delineate the seven areas in controversy and the specific issues relating to each. A review of plaintiffs' motion for contempt and further relief appropriately begins with an examination of single-occupancy cells for designated prisoners.

I.

### SINGLE–CELL HOUSING

#### The Issues

In maintaining that TDC should be held in contempt of court with regard to the alleged failure to afford sufficient single-occupancy cells, plaintiffs allege that: 1) TDC failed to provide single-cell housing for prisoners identified as requiring it on the bases of vulnerability, assaultiveness, mental retardation, psychiatric condition, or medical problems; 2) the single-celling of vulnerable and assaultive prisoners in administrative segregation areas violates court orders; and 3) insufficient cellblock housing restricts two-thirds of the female prisoners identified as requiring single-occupancy cells to dormitory housing. The plaintiff class demands that TDC be ordered to house all prisoners in single-occupancy cells who have been identified as requiring it under the court's orders, forthwith, with a fine of $1,000.00 per prisoner, for each day that TDC is remiss in this relation.

In reply, TDC asserts that, within the past two years, it has complied substantially with the single-celling requirements. Moreover, TDC challenges plaintiffs' contention that the relevant orders or decrees prohibit the single-celling of vulnerable and assaultive inmates in administrative segregation. TDC argues, therefore, that no relief is necessary.

TDC admits that it has not provided single-occupancy cellblock housing for significant numbers of women prisoners who arguably require it. In explanation, TDC asserts that the Classification Plan permits women to be housed in dormitories, and "[t]hat before concluding that additional costly cells are needed for women, the court should allow TDC to propose an alternative plan." Defendants' Return, p. 11. Plaintiffs maintain, however, that the alternative plan submitted by defendants would permit the continued placement of women prisoners in dormitories who, under the terms of the present order, should be assigned to medium and close custody facilities.

#### Findings of Fact

1. Paragraph II.F of the "Stipulation and Order Modifying the Court's Order of January 11, 1984," filed on May 2, 1984, provides that:

Defendants shall forthwith take the following steps:

\* \* \* \* \* \*

F. None of the following prisoners shall be confined to a cell with another prisoner or to a dormitory:

1. Prisoners confined to administrative segregation at the Ellis and Coffield Units.

2. Prisoners who are medical in-patients of a TDC infirmary, intermediary care facility, or hospital and whose treating physician recommends that they not be doubled celled or housed in a dormitory; prisoners who are recognized as intellectually impaired pursuant to the intellectually impaired offender plan, and prisoners who are physically handicapped, as will be defined in the TDC comprehensive health care plan, Standard 150, and whose ITP (Individualized Treatment Plan) recommends they not be double celled or housed in a dormitory.

3. Prisoners who are either psychiatric in-patients, out-patients, or under psychiatric observation pursuant to the psychiatric services plan, unless the treating psychiatrist or the prisoner's ITP recommends double celling or a dormitory assignment for therapeutic purposes.

4. Prisoners whom the unit classification committee deems to be assaultive or vulnerable to the extent that they cannot safely be housed with another prisoner, or in a dormitory.

2. In the fall of 1984, TDC took the position that this agreement required the single-celling of prisoners only on the Ellis and Coffield Units, and did not require the single-celling of prisoners system-wide. Tr. 262.

3. Paragraph II.I.1 of the "Stipulation Modifying Crowding Provisions of Amended Decree" (Crowding Stipulation), approved by a court order dated July 26, 1985, states:

## II. CAPACITY

I. *Prisoners Required to be Assigned to Single-Occupancy Cells.*

1. Defendants shall assign the following classes of prisoners to single occupancy cells:

(a) all prisoners under sentence of death;

(b) all prisoners confined in administrative segregation;

(c) all prisoners who are determined through the classification process to be assaultive or vulnerable to the extent they cannot safely be assigned to double occupancy cells or dormitory housing;

(d) all prisoners assessed to be mentally retarded pursuant to the Mentally Retarded Offender Plan, December 1, 1984, if their individual habilitation plans recommend that they be housed in a cell alone;

(e) all prisoners with a diagnosed psychiatric illness, as defined by the Psychiatric Services Plan, February 14, 1984, and the Comprehensive Health Care Plan, Chapter 150, December 15, 1984, who are assigned to a psychiatric acute care facility or a psychiatric intermediate care facility, unless the prisoner's individual treatment plan recommends double celling; provided, however, that in the event such a prisoner is assigned to a double occupancy cell, his treatment team first determines that such assignment is compatible with the treatment plan of the prisoner's assigned cellmate;

(f) all prisoners with a diagnosed psychiatric illness, as defined by the Psychiatric Services Plan, February 14, 1984, and the Comprehensive Health Care Plan, Chapter 150, December 15, 1984, who are being treated on out-patient status, if their individual treatment plans recommend that they be housed in a cell alone; and

(g) all prisoners whose medical treatment plans recommend that they be housed in a cell alone; provided, however, that the housing assignment of any patient housed at the TDC Hospital at the Univeristy of Texas Medical Branch—Galveston shall be determined by appropriate medical personnel at that unit.

2. The parties [8] entered into the Crowding Stipulation with the contemplation that TDC may experience a substantial increase or decrease in its population; that the rate of crime and/or conviction within the state of Texas may continue at its current rate or increase or decrease substantially; that the incidence of parole may increase or decrease substantially; that the cost of construction of new facilities and/or renovation of exist-

[8] Judicial notice is taken that, to avert the population restrictions requested by plaintiffs' Motion to Modify Amended Decree, TDC negotiated the Crowding Stipulation with the plaintiffs. The agreement bears not only the signatures of counsel for plaintiffs and for defendants, but also those of TDC's General Counsel, the Director of the Texas Department of Corrections, the Chairman of the Texas Board of Corrections, and the Attorney General of the State of Texas.

ing facilities may increase or decrease substantially; that substantial difficulty may or may not be encountered by TDC in attracting and employing security and non-security staff; and that substantial construction delays may or may not occur with respect to the renovation of existing units or the construction of new facilities, units or additions thereto.

Crowding Stipulation, p. 33. In an order approving the Crowding Stipulation in its entirety, the court stated: "[N]one of these eventualities, should they occur, will affect the scope of defendants' obligations under the *Stipulation.*" Order filed July 26, 1985, p. 5.

3. The Crowding Stipulation established the following schedule for the assignment of prisoners to single-occupancy cells:

All prisoners confined in administrative segregation shall be assigned to single occupancy cells as follows: 60% forthwith; 75% by September 1, 1986; 85% by September 1, 1987; 90% by September 1, 1988; and 100% by September 1, 1989. All prisoners described in Sections II.I. 1.(c), (d), (e), (f), and (g), *supra*, shall be assigned to single occupancy cells forthwith.

4. The Crowding Stipulation, agreed to by the parties on May 10, 1985, provided that "all prior orders of the Court in this cause shall remain in full force and effect except to the extent specifically noted." The Crowding Stipulation, p. 1. Paragraph II.F of the "Stipulation and Order Modifying the Court's Order of January 11, 1984," was not exempted.

5. TDC took no steps to comply with the court's orders to single-cell prisoners prior to March 27, 1985, when TDC Administrative Bulletin No. 85–44 was issued. Tr. 264. The Bulletin listed the criteria necessary to single-cell an inmate deemed too assaultive or vulnerable to live in a double-occupancy cell or dormitory. Plaintiffs' Exhibit No. 21; Defendants' Exhibit No. 99; Tr. 241, 428.

6. Notwithstanding the fact that both the April 1984, Order and the Crowding Stipulation required immediate action, no evidence was presented which showed TDC's actual placement of any inmates into single-occupancy cells before April 1985. Defendants' Exhibit No. 9; Tr. 225.

7. In April 1985, TDC devised a computer program to monitor identification of inmates requiring single cells. Individual units were notified of this monitoring process on April 22, 1985. Tr. 56.

8. TDC later altered the system to permit the double-ceiling of prisoners identified as eligible for single-celling. Rather than prohibit the deployment of another prisoner to a cell with a "single-cell" prisoner, TDC programmed the computer to send an "error message," stating that one of the prisoners assigned to that cell was improperly housed. Tr. 129, 755.

9. In June 1985, TDC compiled information regarding compliance in the area of single-celling. Plaintiffs' Exhibit Nos. 16, 17. An emphasis on the identification process was evident in September 1985. Instructions to regional directors in all units stated: "[w]e emphasize as an absolute requirement that the unit should identify and designate all inmates requiring single celling pursuant to our administrative bulletins, and that under no circumstances would a lack of single cell facilities be justification for the non-adherence to that policy." Tr. 753. TDC did not show a similar concern regarding the veritable disposition of prisoners to single cells. Defendants' Exhibit No. 114.

10. Through December 1985, the data generated from TDC's Weekly Single Cell Reports verified that some prisoners in every single-cell category were double-celled because of insufficient bed space. Defendants' Exhibit No. 9; Tr. 127–28. Table 1 provides a summary of the prisoners incorrectly double-celled. Defendants' Exhibit No. 7.

Table 1

| Date | Total Number of Prisoners Identified as Requiring Single-Occupancy Cells | Total Number of Prisoners Identified for Single-Occupancy Cells but Double-Celled |
|---|---|---|
| 7–18–85 | 1775 | 358 |
| 8–15–85 | 2071 | 278 |
| 8–23–85 | 2166 | 314 |
| 9–6–85 | 2364 | 70 |

Table 1

| Date | Total Number of Prisoners Identified as Requiring Single-Occupancy Cells | Total Number of Prisoners Identified for Single-Occupancy Cells but Double-Celled |
|---|---|---|
| 9–13–85 | 2450 | 56 |
| 9–18–85 | 2503 | 57 |
| 9–24–85 | 2486 | 68 |
| 10–4–85 | 2968 | 354 |
| 10–8–85 | 3287 | 635 |
| 10–11–85 | 3326 | 640 |
| 10–18–85 | 3508 | 626 |
| 10–22–85 | 3510 | 619 |
| 10–30–85 | 3544 | 518 |
| 11–07–85 | 3522 | 491 |
| 11–14–85 | 3566 | 497 |
| 11–21–85 | 3663 | 454 |
| 11–28–85 | 3629 | 504 |
| 12–04–85 | 3720 | 533 |
| 12–12–85 | 3701 | 452 |
| 12–19–85 | 3713 | 326 |
| 12–27–85 | 3646 | 320 |
| 1–4–86 | 3670 | 263 |
| 1–7–86 | 3676 | 264 |
| 1–14–86 | 3671 | 260 |
| 1–21–86 | 3644 | 253 |
| 1–30–86 | 3490 | 181 |
| 2–4–86 | 3525 | 179 |
| 2–15–86 | 3445 | 36 |
| 2–20–86 | 3471 | 40 |
| 2–28–86 | 3477 | 35 |
| 3–6–86 | 3482 | 34 |
| 3–12–86 | 3452 | 31 |
| 3–20–86 | 3438 | 38 |
| 3–26–86 | 3406 | 34 |
| 4–1–86 | 3410 | 36 |
| 4–8–86 | 3372 | 30 |
| 4–15–86 | 3402 | 36 |
| 4–20–86 | 3385 | 28 |
| 4–29–86 | 3398 | 26 |
| 5–8–86 | 3392 | 8 |
| 5–15–86 | 3375 | 7 |

11. As reflected in Table 1, TDC's brief success in the placement of prisoners in single-cells was interrupted for an extended period of time. The dramatic increase in the percentage of prisoners inappropriately double-celled followed immediately after TDC's reevaluation of potentially assaultive prisoners and those with purported gang affiliations. An emergency situation which arose in September 1985, demonstrated the inflexibility relating to housing inherent in TDC's crowded system. The emergency continued for eight weeks, and numerous prisoners who had been designated for single-celling were, instead, confined in double cells during this period.

12. The extensive violence perpetrated by prisoners, which served as the underlying rationale for the September 1985, lockdown, was predicted a year prior to its occurrence. Judicial notice is taken of the Benton and Stoughton Report, cited in the November 20, 1984, order approving the Report of the Special Master Concerning the Nineteenth Monitor's Report of Factual Observations to the Special Master—Report on Section II.C of the Amended Decree (Use of Force), which noted:

The TDC faces [a] ... critical challenge. Within the agency, much of the recent focus on inmate management has emphasized the elimination of certain control practices such as the use of building tenders and the use of force. Attention has been focused on what *not* to do. However, the safe, effective, and ultimately constitutional operation of the prisons must begin with the control of management of the prisoners by the staff. Without such control and management, abuse of prisoners by staff is replaced with other equally pernicious forms of abuse. For the TDC, maintaining this control and management is complicated by several factors:

Many of the TDC institutions must manage prisoners in large groups—for work, dining, and even general living (in open dormitories). In conventional correctional terms, these are often very large groups—more prisoners in a dormitory or dining area than certain prison systems would permit in an entire institution. It may have been possible to control such populations using building tenders or the threat of illegal force. However, without these methods of control, the achievement of effective management and control is made more difficult.

Gang structures outside of Texas prisons are reported by TDC officials to be attempting to assert their influence within the system. Certain state prison systems face almost impossible control problems in dealing with gangs. Reportedly, Texas has thus far experienced only limited gang influence within its prisons. To whatever extent a "power vacuum" is permitted to exist within the prisons, gangs will probably assert their poisonous influence.

The consultants have little doubt that the TDC can, through the implementation of recommendations in this report, restrain the unnecessary and excessive use of force within its prisons. Inappropriate control systems must be replaced, however, by other effective and appropriate control systems. The consultants have observed an ambivalence, on the part of staff within the institutions visited, concerning the management and control of prisoners. The staff recognize the importance of control, but they are unsure as to how to assert control. Officials are aware of control problems, but they are not sure of what the TDC expects them to do to resolve the problems.

This is a dangerous situation that becomes more dangerous as time passes. It is important that the TDC develop and implement a short-term and long-term strategy to maintain control in the management of the inmate population. This strategy must not consist of unconstitutional methods, including those prohibited in this litigation. Therefore the strategy will probably entail more traditional prison control systems such as classification, separation, secure confinement, and application of disciplinary procedures. Equally important is the enhancement of TDC's traditional system of positive time-credit incentives for good behavior that has been central to prison management in Texas.

It is a difficult and precarious business to manage and operate any prison or prison system, and it is going to be doubly so for the State of Texas during this transition period and for the foreseeable future. Maintaining the capacity to control and manage the prisoners will require numerous changes in operational practice, and perhaps in law. This process will need the support of elected officials and other policy makers. If these things do not occur and prisoners realize they have nothing to fear and nothing to lose, TDC institutions will become unmanageable and very dangerous.

Development and implementation of such a strategy should be a primary task of the Board of Corrections and the new Director that they will select. A realistic and effective strategy will cost additional tax dollars, and may require other legislative action as well. However, failure to develop an effective management and control strategy in a timely manner will inevitably result in tragedy and even greater cost.

Benton and Stoughton Report, pp. 3–4.

13. TDC did not heed this warning. After substantial delay and denial of its immanence, TDC eventually dismantled the building tender system. The violence that erupted thereafter was particularly hideous, and resulted in numerous homicides of prisoners. Plaintiffs' Exhibit No. 28; Defendants' Exhibit Nos. 15, 97, 98; Tr. 370–72.

14. The percentage of the double-celled prisoners decreased after early October 1985. Nonetheless, TDC was unable to reduce the percentage by a substantial margin until February 1986. As illustrated by the chart below, an average of twenty-five percent. of all prisoners classified as too assaultive to be housed with other prisoners were not assigned to single-occupancy cells.

Table 2

| Date | Total Number of Prisoners Identified as Assaultive | Total Number of Prisoners Identified as Assaultive for Single-Occupancy Cells but Double-Celled |
|---|---|---|
| 7–18–85 | 827 | 184 |
| 8–15–85 | 991 | 228 |
| 8–23–85 | 987 | 218 |
| 9–6–85 | 1072 | 36 |
| 9–13–85 | 1075 | 24 |
| 9–18–85 | 1090 | 23 |
| 9–24–85 | 1112 | 31 |
| 10–4–85 | 1565 | 314 |
| 10–8–85 | 1923 | 606 |
| 10–11–85 | 1934 | 593 |
| 10–18–85 | 1939 | 578 |
| 10–22–85 | 1942 | 574 |
| 10–30–85 | 2004 | 474 |
| 11–07–85 | 1972 | 424 |
| 11–14–85 | 1994 | 439 |
| 11–21–85 | 2007 | 402 |
| 11–28–85 | 1997 | 456 |
| 12–04–85 | 2032 | 481 |
| 12–12–85 | 1976 | 404 |
| 12–19–85 | 1936 | 291 |
| 12–27–85 | 1927 | 271 |
| 1–4–86 | 1924 | 232 |
| 1–7–86 | 1926 | 226 |
| 1–14–86 | 1916 | 224 |
| 1–21–86 | 1905 | 213 |
| 1–30–86 | 1819 | 160 |
| 2–4–86 | 1810 | 151 |
| 2–15–86 | 1855 | 15 |
| 2–20–86 | 1845 | 15 |

### Table 2

| Date | Total Number of Prisoners Identified as Assaultive | Total Number of Prisoners Identified as Assaultive for Single-Occupancy Cells but Double-Celled |
|---|---|---|
| 2–28–86 | 1827 | 14 |
| 3–6–86 | 1831 | 15 |
| 3–12–86 | 1827 | 14 |
| 3–20–86 | 1827 | 16 |
| 3–26–86 | 1827 | 14 |
| 4–1–86 | 1812 | 16 |
| 4–8–86 | 1797 | 12 |
| 4–15–86 | 1788 | 15 |
| 4–20–86 | 1762 | 13 |
| 4–29–86 | 1748 | 12 |
| 5–8–86 | 1739 | 2 |
| 5–15–86 | 1748 | 4 |

15. While the number of vulnerable prisoners identified as requiring single-occupancy cells increased only slightly, the percentage of those improperly double-celled nearly tripled by early December 1985, as indicated by Table 3.

### Table 3

| Date | Total Number of Prisoners Identified as Vulnerable | Total Number of Vulnerable Prisoners Identified for Single-Occupancy Cells but Double-Celled |
|---|---|---|
| 7–18–85 | 201 | 35 |
| 8–15–85 | 222 | 15 |
| 8–23–85 | 221 | 22 |
| 9–6–85 | 228 | 5 |
| 9–13–85 | 227 | 9 |
| 9–18–85 | 230 | 9 |
| 9–24–85 | 227 | 6 |
| 10–4–85 | 206 | 9 |
| 10–8–85 | 208 | 5 |
| 10–11–85 | 208 | 10 |
| 10–18–85 | 220 | 18 |
| 10–22–85 | 229 | 14 |
| 10–30–85 | 227 | 16 |
| 11–07–85 | 240 | 21 |
| 11–14–85 | 244 | 22 |
| 11–21–85 | 247 | 22 |
| 11–28–85 | 244 | 23 |
| 12–04–85 | 242 | 24 |
| 12–12–85 | 244 | 22 |
| 12–19–85 | 243 | 15 |
| 12–27–85 | 241 | 17 |
| 1–04–86 | 240 | 9 |
| 1–7–86 | 239 | 13 |
| 1–14–86 | 243 | 12 |
| 1–21–86 | 233 | 7 |
| 1–30–86 | 151 | 5 |
| 2–4–86 | 146 | 5 |
| 2–15–86 | 133 | 4 |
| 2–20–86 | 134 | 7 |
| 2–28–86 | 128 | 4 |
| 3–6–86 | 128 | 4 |

| 3–12–86 | 130 | 5 |
|---|---|---|
| 3–20–86 | 130 | 4 |
| 3–26–86 | 146 | 4 |
| 4–1–86 | 144 | 5 |
| 4–8–86 | 138 | 3 |
| 4–15–86 | 141 | 3 |
| 4–20–86 | 187 | 3 |
| 4–29–86 | 187 | 4 |
| 5–8–86 | 183 | 2 |
| 5–15–86 | 178 | 0 |

16. TDC properly housed medical patients requiring single-occupancy cells, with only occasional lapses. The initial progress was less favorable in the two remaining categories, for, as shown below, the percentage of double-celling increased for mentally retarded prisoners, and only remained constant for mental health patients.

### Table 4

| Date | Mentally Retarded Prisoners Requiring Single-Occupancy Cells | Mentally Retarded Prisoners Inappropriately Double-Celled |
|---|---|---|
| 7–18–85 | 186 | 90 |
| 8-15–85 | 196 | 17 |
| 8–23–85 | 233 | 49 |
| 9–6–85 | 225 | 22 |
| 9–13–85 | 220 | 10 |
| 9–18–85 | 218 | 11 |
| 9–24–85 | 215 | 14 |
| 10–4–85 | 215 | 16 |
| 10–8–85 | 212 | 18 |
| 10–11–85 | 271 | 15 |
| 10–18–85 | 262 | 17 |
| 10–22–85 | 259 | 17 |
| 10–30–85 | 255 | 14 |
| 11–07–85 | 253 | 24 |
| 11–14–85 | 248 | 19 |
| 11–21–85 | 242 | 15 |
| 11–28–85 | 231 | 13 |
| 12–04–85 | 254 | 17 |
| 12–12–85 | 266 | 14 |
| 12–19–85 | 265 | 13 |
| 12–27–85 | 262 | 15 |
| 1–4–86 | 261 | 12 |
| 1–7–86 | 261 | 14 |
| 1–14–86 | 257 | 15 |
| 1–21–86 | 251 | 19 |
| 1–30–86 | 224 | 11 |
| 2–4–86 | 230 | 13 |
| 2–15–86 | 209 | 7 |
| 2–20–86 | 205 | 10 |
| 2–28–86 | 203 | 9 |
| 3–6–86 | 206 | 10 |
| 3–12–86 | 206 | 8 |
| 3–20–86 | 206 | 8 |
| 3–26–86 | 205 | 6 |
| 4–1–86 | 211 | 9 |
| 4–8–86 | 196 | 8 |
| 4–15–86 | 195 | 7 |
| 4–20–86 | 195 | 6 |
| 4–29–86 | 195 | 1 |
| 5–8–86 | 195 | 0 |
| 5–15–86 | 193 | 0 |

Table 5

| Date | Mental Health Prisoners Requiring Single-Occupancy Cells | Mental Health Prisoners Inappropriately Double-Celled |
|---|---|---|
| 7–18–85 | 548 | 48 |
| 8–15–85 | 553 | 18 |
| 8–23–85 | 576 | 25 |
| 9–6–85 | 563 | 6 |
| 9–13–85 | 565 | 12 |
| 9–18–85 | 560 | 13 |
| 9–24–85 | 563 | 15 |
| 10–4–85 | 554 | 15 |
| 10–8–85 | 552 | 6 |
| 10–11–85 | 549 | 11 |
| 10–18–85 | 548 | 10 |
| 10–22–85 | 550 | 13 |
| 10–30–85 | 551 | 12 |
| 11–07–85 | 554 | 21 |
| 11–14–85 | 554 | 17 |
| 11–21–85 | 543 | 15 |
| 11–28–85 | 542 | 12 |
| 12–04–85 | 542 | 11 |
| 12–12–85 | 557 | 10 |
| 12–19–85 | 557 | 6 |
| 12–27–85 | 556 | 16 |
| 1–4–86 | 561 | 10 |
| 1–7–86 | 561 | 10 |
| 1–14–86 | 560 | 8 |
| 1–21–86 | 566 | 11 |
| 1–30–86 | 549 | 5 |
| 2–4–86 | 552 | 9 |
| 2–15–86 | 603 | 7 |
| 2–20–86 | 607 | 7 |
| 2–28–86 | 613 | 8 |
| 3–6–86 | 608 | 5 |
| 3–12–86 | 598 | 4 |
| 3–20–86 | 587 | 9 |
| 3–26–86 | 588 | 9 |
| 4–1–86 | 585 | 5 |
| 4–8–86 | 580 | 6 |
| 4–15–86 | 585 | 10 |
| 4–20–86 | 589 | 5 |
| 4–29–86 | 588 | 7 |
| 5–8–86 | 587 | 1 |
| 5–15–86 | 595 | 2 |

17. At the June hearing, TDC maintained that mentally retarded prisoners are single-celled when the treatment team so recommends. Tr. 363. There is, however, some indication that additional cell housing is required. Plaintiffs' Exhibit No. 35.

18. On August 1, 1985, 70.2% of the administrative segregation prisoners were single-celled. From September 1985, through June 1986, TDC assigned all administrative segregation prisoners to single-occupancy cells. Plaintiffs' Exhibit Nos. 1, 45, 46, 47, 49. This compliance

record was unparalleled in any other single-cell category.

19. Prisoners identified as requiring single cells on the basis of assaultiveness or vulnerability have been routinely assigned to administrative segregation. Plaintiffs' Exhibit Nos. 44, 45; Defendants' Exhibit No. 7, pp. 81–83; Tr. 305.

20. The specific purpose underlying the classification plan related to security and protection. Under the terms of the plan, special categories of prisoners were to be housed separately, so as to decrease the likelihood of violence within the prison system; and it was not contemplated that single-celling assignments be associated with punishment. Even with respect to prisoners in an administrative segregation status, this directive is clear. In the plan, restrictions regarding prisoners' privileges and property were deemed to be necessary only for security purposes, and their limitation was not to be based on a punitive rationale.

21. Because of the exiguity of single-occupancy cells, female prisoners were continuously overrepresented among those prisoners improperly housed. Plaintiffs' Exhibit No. 18.

22. The single-celling order made no distinction founded on gender. Yet, at any given time during 1985, a disproportionate number of women were among those prisoners wrongly double-celled. For example, in September 1985, seventy-eight percent. of those prisoners incorrectly housed were females. Plaintiffs' Exhibit Nos. 16, p. 100; 17; 54. TDC's failure to implement the court orders respecting housing for female prisoners is particularly and blatantly culpable.

II.

*Classification*

*The Issues*

The plaintiffs charge that TDC failed to comply with the "Custody Assignment Procedures" set forth in the Classification Plan of December 1984, thus exposing numerous "general population" prisoners to the dangers of being housed with prisoners in the maximum custody classification. In

this regard, plaintiffs contend that the "mixing" of dissimilar custody classifications within the same housing area, as well as the assignment to dormitories of prisoners assigned to a close or medium custody status violates the orders of January 3, 1985, and December 13, 1985.

By way of relief, plaintiffs demand that TDC be ordered not to assign prisoners with different custody classifications (including safekeeping status) to the same cellblock or dormitory; and that it also be precluded from assigning to dormitories prisoners who are not in a minimum custody classification. They further demand that this relief be accorded as quickly as possible, and in no event later than October 1, 1986. Further, the plaintiffs recommend that a fine be levied against TDC, amounting to $100.00 per prisoner, for each day in which violations of these provisions occur; further, that TDC report regarding its compliance every two months, by means of certifications from its wardens. Under this recommendation, the fines would be held by the District Clerk, subject to disposition by subsequent orders of the court.

In defense, TDC contraposes that a finding of contempt would be in error, because the plaintiffs failed to establish that the "classification policies and practices result in the denial of protection against harm from other prisoners that rises to the level of conscious or callous indifference about safety, ... an eighth amendment violation." Additionally, TDC maintains that plaintiffs did not "establish by clear and convincing evidence that mixing can be reduced further within existing capacity." Defendants' Post-Hearing Brief at 37. Neither assertion is legally correct.

TDC's attempt to introduce eighth amendment concerns is inapposite, for the constitutional framework of the classification requirement is not at issue. Nor is it necessary that plaintiffs develop a method (be it depopulation or facility construction) by which TDC might achieve compliance in this area. Rather, to support a finding of contempt, plaintiffs must establish by clear and convincing evidence that TDC has inappropriately mixed custody classifications or

has housed prisoners not in a minimum custody status in dormitories, or has done both, in violation of the stipulations forming the bases for this court's orders.

### Findings of Fact

1. In Section II.E of the *Amended Decree*, it was ordered that TDC file a classification plan which would minimize prisoner-on-prisoner violence and assure that minimum custody prisoners were the only ones housed in dormitories. The *Amended Decree* specified that:

So long as defendants confine more than one prisoner to a cell of sixty square feet or less, or to a dormitory, they shall maintain a classification system assuring that abuses of prisoners by those they live with will be minimized. By August 1, 1981, defendants shall file a plan with the court setting forth an adequate classification system and timetable for its implementation. The plan will include provisions to insure that in the future only minimum security prisoners are assigned to live in dormitories.

2. The Plan provides that:

[c]lassification of inmates who are committed to the Texas Department of Corrections is a continuing process that begins the day that the inmate is delivered to the custody of the Department and that ends only when the inmate is released from custody. Classification encompasses virtually all decisions that affect the inmate's life during the entire period of incarceration. Assignments to custody, housing, programs, work, treatment, and other activities and decisions relevant to furloughs and good conduct time award evolve from classification decisions that are issued by the Texas Department of Corrections classification Committee.

Classification Plan, p. 15.

3. TDC's December 1984 Classification Plan provides, in pertinent part:

a. Minimum custody inmates shall be subject to cell or dormitory housing with the following exceptions:

1) minimum custody inmates shall be assigned to dormitories on a priority basis;

2) minimum custody inmates shall be assigned to housing areas that are designated as minimum custody only.

b. Medium custody inmates shall be assigned to cell housing, (except medium custody women who shall be housed in dorms until cell housing is available) housing [sic] that is designated as medium custody housing only.

c. Close custody inmates shall be confined to cell housing with the following exceptions:

1) female inmates may be assigned to dormitories until an adequate number of cells are constructed at female units;

2) close custody inmates shall be assigned to housing areas that are designated as close custody only.

d. Maximum custody (Administrative Segregation) shall require the highest degree of custody supervision.

4. The Administrative Segregation Plan, approved by court order dated March 8, 1983, restricted housing of these prisoners to specific cells or cellblocks, exclusive of solitary confinement cells, except in rare instances. Classification Plan, p. 146.

5. On January 3, 1985, it was ordered that immediate implementation of the 1984 Classification Plan be executed; and those provisions were made permanent by an injunction, dated December 13, 1985.

6. TDC identified two categories where prisoners of dissimilar classifications are housed together: "designated mixed housing" and "overflow." Designated mixed housing occurs when the housing scheme permits different custody classifications to be assigned to the same cellblock. For example, a cellblock may house prisoners in different custody classifications on different tiers by reason of its design.[9] Overflow represents a unit's departure from the housing scheme, in the respect that prisoners of different custody categories are assigned to the same cellblock. While an entire cellblock may be designated for medium custody prisoners only, overflow mixing places close custody prisoners in that housing area, because of the unavailability of appropriate housing. Plaintiffs' Exhibit Nos. 16, p. 92, 17, 19, 22, 23, 24, 46, 50; Defendants' Exhibit Nos. 6, 10, 103; Tr. 8, 201–02, 224, 313, 315.

7. Not until February 1986, did TDC begin to address the problems associated with mixing. Plaintiffs' Exhibit No. 43; Tr. 214–15. Throughout the show cause hearing, TDC admitted that some 400 prisoners remained improperly housed. Tr. 201, 836. TDC suggested that it will be unable to reduce this figure before the scheduled 1987 depopulation of the prison. Tr. 71, 203, 204, 266, 469.

8. The Special Master's Office credibly estimated that, at any given point in 1985, the number of "mixed" prisoners exceeded 3,000. It is apparent that TDC's reporting of significantly smaller numbers is inconsistent with its subsequent statement that, at the height of its "unmixing," some 6,000 prisoners were transferred. Plaintiffs' Exhibit Nos. 17, 22, 23; Tr. 219, 223, 332.

9. While TDC purported to assign "overflow" prisoners to the next best housing placement (*e.g.*, assigning close custody prisoners to medium confinement cellblocks, instead of to minimum housing facilities), all custody classifications continued to be mixed through July 1986. Tr. 182, 298–99, 310, 314. When an overflow occurred in the administrative segregation area, solitary cells were utilized. Plaintiffs' Exhibit Nos. 23, 45, 46, 56, 65, 66, 80, 83.

10. A deficiency still exists in cell housing for close and medium custody female prisoners, even after the recent construction of ninety-six cell beds in fifty-two cells (forty-four double-occupancy cells and eight single cells). Tr. 440. TDC and the Special Master's Office differ as to the remaining beds needed, but each figure exceeds 100. Plaintiffs' Exhibit Nos. 18, 20; Defendants' Exhibit No. 8; Tr. 253–55,

---

**9.** Even where inmates of dissimilar custody classifications are housed on different tiers, contact between them may occur in dayrooms, showers, dining halls, and during recreation.

437–38. Judicial notice is taken of the Thirty-Third Monitor's Report—Report to the Special Master Concerning Implementation of the Classification Plan, filed September 19, 1986, wherein cell housing deficiencies in the women's units were noted.

11. TDC has reviewed several approaches to the problems associated with housing for female prisoners. It rejected a proposal to utilize one of the male units to redress the lack of cell housing for females. Tr. 255–56, 336, 356, 365–66. There is some indication that TDC may, inappropriately, attempt to house women prisoners in a close custody status in cells designated for mentally retarded prisoners. Tr. 767. At present, TDC relies on paroles to maintain the female prisoner population at its current level. Tr. 255–56. Additionally, TDC has requested modification of the agreement, so as to eliminate the requirement of cell housing for medium and close custody women prisoners. Defendants' Exhibit No. 96, p. 53; Tr. 251, 556, 569–70, 1125–26.

12. Plaintiffs cited several uncontroverted incidents of violence in designated mixed housing and overflow housing. By way of example, on November 17, 1985, a minimum custody prisoner, housed on the fourth tier, was stabbed (non-fatally) in the first tier dayroom. The attacker was a medium custody prisoner who was housed on the first tier. Violence is also present in the dormitory designated for women prisoners in a close custody status. Reported incidents include prisoner-on-prisoner attacks and assaults on TDC staff. Plaintiffs' Exhibit Nos. 32, 33, 34, 68, 69, 81; Tr. 522.

## III.

### STAFF DEPLOYMENT

#### The Issue

Plaintiffs allege that TDC failed to deploy correctional officers in several of the housing areas, in violation of the "Order Implementing Staffing Provisions of the Stipulated Modification," dated October 26, 1982. As a means of obtaining relief, the plaintiffs proposed the assignment of correctional officers to cellblocks by September 1, 1986, and to dormitories by November 1, 1986. It was also suggested by plaintiffs that the posted officers engage in continuous surveillance and irregular but frequent patrols; and that by January 1, 1987, TDC be required to employ a staff sufficient to generate a 1:6 staff/prisoner ratio. Finally, the plaintiff class recommended that TDC's failure to conform to this provision result in a fine against it of $5,000.00 per day for each unit, for every such failure, the funds to be held by the District Clerk until further order of the court.

In opposition, TDC contends that the October 1982, order will not support a finding of contempt, inasmuch as strict compliance with a joint National Institute of Corrections/TDC study (to which reference was made) was not compelled. As a posited good and sufficient reason to modify the order, TDC cited the numerous complexities inherent in the transition from a system largely controlled by prisoners to one in which the staff exercises authority. Moreover, TDC requested an extension of time to place correctional officers in the housing areas.

An examination of the October 1982, order and the staffing study mentioned above will begin this discussion.

#### Findings of Fact

1. Section XII of the Stipulated Modification of Section II,D and Section II,A of the Amended Decree (Stipulated Modification) established a process for determining the minimum number of officers required to staff TDC adequately. The process involved a study jointly undertaken by TDC and the National Institute of Corrections during the summer of 1982. In this period, each group utilized two experts to perform an analysis of the needed number of security officers for the Texas prison system.

2. This study formed the basis for dismantling the building tender system. The study was designed to determine the appropriate number of correctional officers necessary at every unit, in order to make adequate provisions for the required posi-

tions on each shift, all to the end that TDC staff members, and not prisoners, would perform the functions prescribed by the Stipulated Modification.

3. The Staffing Study made it plain that the assignment of security officers to TDC housing areas should be mandatory:

Throughout the report the teams have recommended placing officers inside the cellblocks and dormitories. Such assignments are mandatory to properly carry out the Agreement. The placement of correctional officers on such assignments represents the minimal coverage required to provide a reasonable safe environment.

Staffing Study, p. xii.

4. Following the study, the experts involved issued a Final Report in September 1982, which detailed the staff required for various positions, and also set forth the necessary points of deployment within the housing areas.

5. In the order approving the Final Report on October 26, 1982, it was stated that:

Defendants shall retain the discretion to deploy staff in whatever manner they deem appropriate, provided that (a) they shall use the Final Report as a guideline, (b) staff deployment shall be substantially in compliance with the assumptions and recommendations of the Final Report, and (c) deployment shall meet the conditions of the Stipulated Modification.

6. It is apparent that no discretion was granted to TDC regarding whether deployment would occur, since the October 26, 1982, order made it obligatory that TDC employ and maintain staff in accordance with the timetables of Section XIII of the Stipulated Modification:

Specifically, the required staff for the Ramsey I, Ellis and Eastham Units shall be employed and maintained as quickly as possible and not later than January 1, 1983; the required staff for the Coffield, Ramsey II, Retrieve and Darrington Units shall be employed and maintained as quickly as possible and not later than January 1, 1984; and the required staff shall be employed and maintained for all other units as quickly as possible and not later than January 1, 1985.

7. This order implementing the staffing study was modified on July 11, 1983, when, in consideration of changed circumstances, the elimination of payroll officer positions was approved.[10] The total number of officers required under the Stipulated Modification and the staffing study, however, was not decreased.[11] *See* Plaintiffs' Exhibit Nos. 29, 30, 31; Defendants' Exhibit No. 25; Tr. 594-95, 639.

8. As the Court of Appeals for the Fifth Circuit noted in its affirmance of the Stipulated Modification, this court's remedial decree ordered that:

TDC double its staff-prisoner ratio to one uniformed staff member for every six prisoners. It specified how TDC was to deploy the staff in prisoner living areas, permitting TDC to alter the deployment pattern only upon a showing that the "prescribed staffing pattern is unnecessary in the particular instance."

*Ruiz v. McKaskle,* 724 F.2d 1149, 1151 (1984).

9. Despite this specific mandate that officers be posted inside the cellblocks and dormitories throughout TDC, no officers were actually assigned to any housing ar-

---

**10.** By motion served June 13, 1983, TDC moved to modify the court's order of October 26, 1982. A new commissary system had been implemented, negating the need for payroll officer positions. Because the parties were able to agree, deployment in these areas became unnecessary.

The modification (by stipulation and in an order whose form was approved by the parties) eliminated the staffing study requirements for the posting of payroll officers. The modified order directed that the personnel be disbursed to "other appropriate line officer positions pro-

tecting the safety of prisoners and the security of the institutions." Stipulation and Order Modifying Court's Orders of October 26, 1982, filed July 11, 1983.

**11.** TDC asserts that implementation of the Classification Plan and changes in the mission of several units reduce the need for staff assignments in the living areas. No evidence was presented to substantiate these avouchments, nor has TDC filed a motion to modify the Stipulated Modification in this regard.

eas at ten of TDC's twenty-seven units, as of January 3, 1985. Further, at four additional units, no officers were assigned to a majority of the unit housing areas. Plaintiffs' Exhibit Nos. 29, 37; Tr. 45, 644, 667, 1149.

10. The monitor for TDC's Office of Compliance testified that, at the time of her visits on June 15, 1986, several units had properly deployed staff. Yet, a significant number of units which had been reviewed were not in compliance with the staffing study requirements. Tr. 626–27, 631, 634, 637–38, 654, 656. The monitor's testimony was based on personal observations, data from unit shift rosters, and discussions with unit personnel. Tr. 601, 609–10, 648, 655.

11. Certain TDC wardens admitted that they were unaware of the court order requiring the posting of correctional officers inside the living areas. Others, aware of the deployment directive, chose not to post the officers in favor of use of the staff in other areas. Plaintiffs' Exhibit Nos. 50–53; Defendants' Exhibit No. 22, 126; Tr. 49, 50, 518, 837.

12. TDC insists that it can meet the staffing study requirements by reorganizing its existing clerical staff and employing 550 correctional officers. Under the present budgetary cycle, these new officers would commence employment in September 1987. Testimony revealed that these personnel changes will not result in conformance with the staffing requirements. Plaintiffs' Exhibit Nos. 6, 7, 29, 38, 39, 49, 80; Defendants' Exhibit Nos. 12–14, 17, 22; Tr. 518, 646, 660–61, 663, 665, 791, 792, 888.

13. The tenable and plausible testimony of several penology experts was to the effect that a failure to post correctional officers inside the living areas represents a critical breach of security.

14. The absence of correctional staff in living areas is detrimental for medical reasons, in addition to concerns relating to security. Plaintiffs' Exhibit Nos. 40–42, 50, 75, 76; Defendants' Exhibit Nos. 22, 122, 123, 127, 128; Tr. 1057. The somber testimony of prisoners regarding the critical need for emergency medical assistance, and, as well, the importance of having access to correctional staff at these junctures, forcefully denoted these compelling needs at the show cause hearing. Plaintiffs' Exhibit No. 62; Tr. 1247–48; 1253, 1307, 1381–82, 1387, 1389–90, 1399–1400.

## IV.

### MEDICAL STAFF

#### The Issues

The plaintiffs contend that TDC does not employ a sufficient medical staff to assure the adequate health care which was contemplated by the staffing patterns set forth in Attachment 107–J to the Comprehensive Health Care Plan. To effect relief in this regard, the plaintiffs seek immediate recruitment for the vacant positions, monthly reports from TDC detailing its employment efforts, and a fine of $1,000.00 per day from TDC, for each position with a vacancy rate over ten percent., until it is filled.

TDC admits that it has not employed the medical staff in accordance with the Comprehensive Health Care Plan, but, nonetheless, argues that a finding of contempt is not warranted, inasmuch as the staffing patterns allegedly are merely a guide, and do not manifest a specified number to be used as the benchmark in assessing compliance with the Plan. An examination of the relevant provisions of the Comprehensive Health Care Plan will clarify the staffing requirements.

#### Findings of Fact

1. Under Section I.A of the *Consent Decree*, adopted by order of March 3, 1981, defendants were obligated to file a health care plan sufficient to "assure that prisoners receive necessary medical, dental and psychiatric care," and to provide "adequate inpatient and outpatient psychiatric and other psychological care." The Comprehensive Health Care Plan, filed in December 1984, and the Psychiatric Services Plan, filed March 12, 1984, incorporated staffing patterns representing the numbers of persons agreed by the parties as necessary to

deliver adequate health service. Thereafter, TDC was ordered to implement such plans, and to employ "sufficient staff to constitute the substantial equivalent" of those staffing patterns. *See* paragraph 2, p. 2, of the order to implement the Health Care Plan entered January 2, 1985; the order to implement the Psychiatric Services Plan, entered January 6, 1985; and Section IX.A of the Crowding Stipulation, confirmed by order entered on July 26, 1985.

2. Data has been compiled from the following sources: the Comprehensive Health Care Plan, Attachment 107–J, and the Semi-Annual Progress Report on the Texas Department of Corrections; the Comprehensive Health Care Plan, the Psychiatric Services Plan, the Mentally Retarded Offender Plan, the Physically Handicapped Offender Plan (Reporting Period October 1, 1985 through March 31, 1986), and the June 26, 1986, Stipulation Concerning Health Care Positions.[12] Plaintiffs' Exhibit Nos. 25, 54, 66, 67, 68; Defendants' Exhibit No. 120. These documents establish the patterns shown below, and starkly demonstrate TDC's flagrant lack of compliance.[13]

HEALTH CARE POSITIONS

| POSITION | REQUIRED BY CHCP | FILLED 3–20–86 | FILLED 6–26–86 |
| --- | --- | --- | --- |
| Psychiatrists | 28 | 8.1[13] | 10.9 |
| Physical Therapists | 8 | 0 | 0 |
| Respiratory Therapists | 7 | 2 | 3 |
| Occupational Therapists | 10 | 2 | 3 |
| Registered Nurses | 248 | 53 | 55 |
| Dental Hygienists | 28 | 12 | 12 |
| Dietitians | 9 | 3 | 8 |
| TOTALS | 338 | 80.1 | 91.9 |

3. TDC recruitment efforts included the following: local, regional, and national advertising; attendance at job fairs and career days; direct contact with recent graduates of a variety of medical degree programs; and direct contact with graduating registered nurses. These efforts have proven largely unsuccessful, by reason of the fact that the salaries proffered by TDC are non-competitive. Plaintiffs' Exhibit Nos. 26, 27, 55; Defendants' Exhibit Nos. 1, 2, 3; Tr. 85–86, 722.

4. The court-appointed mental health consultants, Ort and Faiver, found that, in 1983, a private psychiatric hospital in Dallas, Texas, paid newly hired psychiatrists immediately out of their residencies an annual salary between $82,000.00 and $92,000.00. More experienced psychiatrists were earning between $128,000.00 and $158,000.00 per year. Ort and Faiver also noted that the typical staff psychiatrists working in the Michigan Department of Corrections earned $79,500.00 (with or without Board certification), and the highest level earned $95,000.00 (available only to those with Board certification). *See* Ort and Faiver Report, p. 39.

5. TDC offered psychiatrists three employment options: 1) a straight salary of $66,200.00;[14] 2) a contract to work twenty hours a week at a rate of $65.00 per hour, with no benefits; and 3) a contract to work forty hours per week at an annual salary of $83,000.00. Under the third option, the psychiatrist must forego all fringe benefits normally paid to an employee, and must also carry his or her own malpractice insurance. No psychiatrist has selected the third option thus far.

6. At the time of the hearing, TDC had been able to fill only 250 (33%) of the 757

---

12. The parties agreed to this stipulation during the show cause hearing. The data was documented by the attachments, which included letters confirming employment of newly hired personnel, a computerized listing of TDC employees as of June 11, 1986, listings of individual contracts for specialized services (including, but not limited to psychiatrists), applications for employment, a sample contract for physical therapist services, verification of payroll status changes, and letters wherein TDC expressed its interest in regard to future employment of certain applicants. Defendants' Exhibit No. 120.

13. This figure includes full-time psychiatrists as well as those hired on an hourly, contractual basis, with a full-time equivalency calculated.

14. Corrections Psychiatrists: base salary $55,200.00; additional sum to prevent vacancies— $5,000.00; and a housing allowance of $6,000.00. Irrespective of Board certification or professional experience, the salary is capped at $66,200.00.

hours of psychiatric coverage considered by the TDC Medical Director as the minimum requirement. The Psychiatrist Service Plan calls for 1,280 hours of psychiatric coverage (32 psychiatrists at forty hours per week). Thus, TDC had only twenty percent. of the necessary psychiatric coverage.

7. Salary differentials, the remote location of many TDC prison units, and the stigma historically associated with prison employment in the medical profession were offered by the witnesses as explanations for TDC's poor recruitment and retention of psychiatrists.

8. The starting salaries for dental hygienist I and II are $20,712.00 and $25,-224.00, respectively. All TDC positions are classified as dental hygienist I, regardless of the professional experience of the person filling the position. In the absence of salary adjustments, appropriately increased, the Special Master fairly and reasonably questioned whether TDC will be able to fill these positions. Plaintiffs' Exhibit No. 27.

9. In February 1986, TDC reclassified salaries for dental hygienists, respiratory therapists, and dietitian. The increases averaged $3,500.00. Tr. 887. Likewise, salaries for nurses were increased. Plaintiffs' Exhibit Nos. 27, 85; Defendants' Exhibit Nos. 3, 116, 117.

10. Physical therapist positions were allocated to TDC in September 1983. Although efforts were made to recruit for these positions by advertising, TDC had not received any applications from registered physical therapists at the time of the hearing. Comparative salaries make it evident that TDC's starting salary of $24,336.00 is not competitive. Court-appointed experts recommended salaries of $25,000.00 to $30,-000.00 as being necessary to attract experienced registered physical therapists. The Texas Department of Health, and also the Texas Department of Mental Health and Mental Retardation, employ registered physical therapists at initial salaries of $25,224.00 or $29,736.00; and the University of Texas Medical Branch at Galveston pays such therapists $22,716.00 to $32,-

820.00, annually. The community norm in Texas is estimated to be $27,000.00. Plaintiffs' Exhibit No. 27.

11. In 1985, TDC had in excess of fifty wheelchair-bound prisoners, approximately one-half of whom are paraplegic or quadraplegic. A like number of prisoners are mobility-impaired by reason of amputations. The absence of a physical therapist on the staff impairs TDC's ability to provide adequate medical care to the physically handicapped population, and to those prisoners who require rehabilitative physical therapy while convalescing from injuries or illnesses. Tr. 677, 837.

V.

## PHYSICALLY HANDICAPPED PRISONERS

### The Issues

The plaintiffs argue that TDC failed to provide physically handicapped prisoners with adequate medical care, living facilities, working conditions, and, as well, with equal access to work, recreation, vocational and academic education, and other programs for TDC prisoners. Further, the plaintiffs contend that this denial of benefits and services violates Sections I and II of the Consent Decree of March 3, 1981, and Standard 150 of Defendants' Comprehensive Health Care Plan, approved by an order dated January 2, 1985.

In order to achieve compliance with the standards incorporated in the decree and plan, and to ameliorate the present conditions, the plaintiffs propose that TDC take certain immediate actions. In particular, the plaintiffs recommend the following: the immediate transfer to an air-conditioned environment of prisoners with spinal cord lesions at the T–6 interspace or above; appropriate housing for physically handicapped prisoners by December 1, 1986, including the designation of one or more housing areas on units to accomodate prisoners with disabilities; the conversion of a third dormitory at Jester III for wheelchair users by December 1, 1986, with a maximum capacity of twenty prisoners; reductions in the capacity of the remaining two

Jester III dormitories; the completion of the modifications specified in the Meier/Rheinecker report by December 1, 1986, coupled with the air-conditioning requirement; permission for mobility-impaired prisoners to shower at any time, as necessary; ready availability to such prisoners of extra bed linens and clothing; medical evaluations of all mobility-impaired prisoners housed at Jester III by a qualified psychiatrist (who will update the individualized treatment plans); the employment by such date of at least one physical therapist and one physical therapist assistant; implementation of the Revised Physically Handicapped Plan (June 1986), except for portions inconsistent with the above-mentioned provisions; the preparation and filing of a supplemental plan, with the assistance of a psychiatrist, by September 1, 1986; the compilation of a comprehensive listing of male and female prisoners, denoting their specific handicapping conditions, by October 1, 1986, which will also set forth the unit assignment, housing location, job and other program assignments for such prisoners; and the submission of a report from the Special Master concerning defendants' compliance with the aforementioned provisions, to be filed by January 1, 1987.

Plaintiffs also seek a fine of $500,000.00 from TDC for its alleged contempt, to be disbursed to physically handicapped prisoners institutionalized from April 20, 1982, to the present. The plaintiffs also propose that the award per prisoner be limited to $300.00, for each month of confinement; further, should the entire amount not be disbursed, that the funds be returned to TDC, with instructions that they be used to improve facilities, programs, and services for the physically handicapped; and, finally, that the failure to comply with any of these provisions result in a fine to TDC, the amount and disposition of which to be determined by further order of the court.

TDC maintains that the Consent Decree does not require equal access to programs. Defendants' Post Hearing Brief at 65. Claiming that handicapped prisoners do not enjoy a suspect classification under the equal protection clause of the fourteenth amendment, TDC argues that any rational reason for disparity in the treatment of such prisoners will survive judicial scrutiny. In this relation, TDC posits that the practical concern of excessive expense justifies the allegedly disparate treatment of this special class of prisoners.

### Findings of Fact

1. The Consent Decree, filed April 20, 1981, provides in part:

I. Health Care

\* \* \* \* \* \*

C. No prisoner shall be denied access to work, recreation, education or other programs or opportunities because of health status unless required for medical reasons as determined by a licensed physician.

II. Special Needs Prisoners

Special needs prisoners shall be defined as those who are mentally retarded, *physically handicapped*, developmentally disabled or require psychological or psychiatric care. Defendants will provide all special needs prisoners with adequate medical care, adequate living facilities and working conditions (if appropriate), fair discipline, and protection from other prisoners. By September 1, 1981, Defendants will file with the Court a plan which includes provision for:

1. a system for adequately identifying special needs prisoners and for evaluating their needs;

2. individualized treatment and placement plans appropriate for such prisoners' needs and assurances for their implementation;

3. architectural modifications of portions of existing facilities to permit, insofar as possible, physically handicapped prisoners access to programs and activities; . . . .

(Emphasis added.)

2. The Amended Stipulation and Order—Huntsville Unit Infirmary, March 1983, more specifically provided:

Defendants shall place physically handicapped prisoners who do not require hospital or infirmary care in a setting that

maximizes their access to TDC programs, services and activities available to general population inmates. The Defendants shall immediately evaluate the measures taken with respect to housing for physically handicapped prisoners. As soon as possible, but no later than May 1, 1983, Defendants shall prepare and implement an interim plan to maximize their access to such programs, services and activities. The interim plan may involve housing handicapped prisoners in the Huntsville Unit Infirmary on a short-term basis only if that is the setting which, before modifications can be made at more appropriate settings, maximizes handicapped prisoners' access to programs, services and activities. The interim plan will provide for the implementation of necessary measures and modifications so that handicapped prisoners will be housed in a setting, other than the Huntsville Unit Infirmary, which meets their needs and maximizes their access to programs, services activities. Those necessary measures and modifications shall be implemented as quickly as possible and no later than September 1, 1983. The long-term housing of handicapped prisoners shall be provided for in the Special Needs Plan prepared pursuant to Section II of the Consent Decree.

3. In response to the Consent Decree, TDC filed the plans referred to below, on the dates there set forth, each of which addresses special needs prisoners: Psychiatric Services Plan, February 1984; Interim Intellectually Impaired Offenders Plan, February 1984; Comprehensive Health Care Plan, November 1984; Mentally Retarded Offenders Plan, December 1984; Group Behavior Management Program— MROP, June 1985; Physically Handicapped Plan, February 1986; and Revised Physically Handicapped Offender Plan, June 1986.

4. Standard 150 of the Comprehensive Health Care Plan, which referred to physically handicapped prisoners, was filed in November 1984, and was ordered to be implemented on January 2, 1985. It provided that

[p]hysically handicapped prisoners who do not require hospital or infirmary care will be assigned to units which afford them the least physical restriction and which maximize their access to programs, services and activities which are available to general population inmates. According to their physical condition and medical needs, physically handicapped inmates will be assigned to units throughout the TDC system where they have access to general programming and services. The most severely mobility impaired inmates (usually those confined to wheelchairs) are assigned primarily to units where special features permit them access to generally available programming or where special programs are provided.

Comprehensive Health Care Plan, pp. 181–82.

5. Standard 150 further required that TDC, with the expert assistance of a physiatrist,[15] develop a long-term plan for physically handicapped prisoners which would provide for an assessment of inmate needs, an evaluation of existing programming, a determination of needed programming, staged implementation of services, and facilities consistent with management priorities and availability of resources.

6. On January 3, 1986, the Comprehensive Health Care Plan was conditionally approved, and TDC was required to file a plan pertaining to physically handicapped prisoners. A deadline of February 1, 1986, was established.

7. On February 7, 1986, TDC filed a manifestly deficient Physically Handicapped Plan. Defendants' Exhibit No. 118; Tr. 87. Accordingly, in March 1986, a task force was charged with developing a complete and more detailed plan. Plaintiffs' Exhibit No. 63.

8. The Physically Handicapped Plan covers deaf, sight-impaired, and speech-im-

---

**15.** A physiatrist is a physician who specializes in physical medicine and rehabilitation. Tr. 677, 1088.

paired prisoners, in addition to those who are mobility-impaired. Tr. 379, 1093. Testimony at the show cause hearing focused primarily on the treatment of the mobility-impaired prisoners.

9. The location of the physically handicapped prisoners has changed several times since entry of the Consent Decree, but improvement of their living conditions has been only intermittent. Physically handicapped prisoners are housed at the Huntsville Unit Hospital, while severely mobility-impaired inmates were transferred to the Wynne Unit in 1982. Tr. 1065, 1068, 1086, 1298, 1329.

10. The Wynne Unit did not have adequate showers, toilet facilities, or bedding for the mobility-impaired prisoners. Additional deficiencies included a shortage of correctional personnel, no recreation for the prisoners, insufficient medical supplies, and a difficult access for the prisoners to the visitation area. All physically handicapped prisoners were excluded from educational programs, the library, the writ room, and the gymnasium. Tr. 1016–20, 1033, 1034, 1036–40, 1293.

11. Next, the physically handicapped prisoners were relocated to the Goree Unit. Tr. 1042. Dr. Meier and Mr. Rheinecker, experts employed by the Office of the Special Master (both of whom testified at the show cause hearing at TDC's request) made the following observations:

We have many concerns relating to the environment of the wheelchair bound inmates currently assigned to the Goree Unit. Dorm 5 did not appear to be over-crowded and the prisoners there were using hospital beds. However, these beds are of an old style and are too high to permit a safe transfer for mobility impaired inmates. We found Dorms 6 and 7 especially distressing because of the crowded conditions and the bathing and toileting facilities. Not enough room is allowed between the bunks to permit adequate space to maneuver a wheelchair. Bunks beds are quite narrow. This allows minimal space for turning and positioning. Only one shower chair is available for use by the mobility impaired individuals. The seat is constructed of hard plastic. This is not conducive to good skin care. The wheels on this chair are all small. A handicapped inmate is unable to propel himself in these chairs. Access to the shower facilities in these dorms is difficult and another person is required to push the individual into the shower. The shower controls are far out of reach of the seated individual. The assistance of another person is again required to turn on the water. There is no thermostatic control of the water supply to the shower. If the nearby toilet is flushed, the cold water is reduced and produces a sudden stream of hot water from the shower. This poses a danger to an able bodied inmate as well as to the handicapped. Toilets are along the same wall as the showers. With apparent good intent, side bars were placed around one toilet to aid in transfers but this impedes side to side transfers, a safer and preferred method of transfer. The toilets are too low to safely transfer onto from a wheelchair and no elevated seats are available. Outside these dorms, the ramps are too steep and are a danger to all but the strongest wheelchair bound inmates. Ventilation in these dorms is provided by fan systems only. Individuals with spinal cord injuries above T6 have deficits in their thermoregulatory systems. Their bodies are unable to release heat as normal bodies can. Build-up of internal heat can be hazardous. Air-conditioning is essential.

Plaintiffs' Exhibit No. 26.

12. TDC had planned modifications of the Goree Unit to meet the criticisms; nevertheless, testimony showed inadequacies respecting medical care,[16] temperature

---

16. In this regard, one handicapped prisoner testified, without contradiction, that he was diagnosed as having a urinary infection. Although the prisoner was instructed to discontinue use of his catheter, no medicine was prescribed. Thereafter, in January 1986, the prisoner repeatedly made sick calls, requesting treatment of the bacterial infection. An appointment was scheduled for September 1986, at the John Sealy Urology Clinic. In May 1986, it was necessary

control, shower facilities, and mobility for such prisoners (with particular reference to the dining hall and the intake process). Defendants' Exhibit No. 18; Tr. 377, 685–86, 694, 703, 1043–52, 1291, 1304.

13. In May 1986, the physically handicapped prisoners were moved to the Jester III Unit. Approximately sixty wheelchair-bound prisoners were thereafter housed in dormitories 15 and 16. The Meier/Rheinecker report recommended a total capacity of twenty prisoners per dormitory. The toilets, bedding, access to educational and work programs, medical care, transportation, and air conditioning were subsequently found to be grossly deficient for physically handicapped prisoners by Dr. Meier and others. Tr. 375–76, 415, 680–98, 701, 707–08, 720–21, 1063–85, 1095–96, 1277, 1281–82, 1299, 1401.

14. TDC filed a Revised Physically Handicapped Plan on June 23, 1986, the first day of the show cause hearing. Defendants' Exhibit No. 4. The plan appears to be insufficient to alleviate the faults noted above. Tr. 716, 719.

15. Judicial notice is taken of "Plaintiffs' Objections to Revised Physically Handicapped Offenders Plan (June 1986)," dated July 22, 1986. The plaintiffs noted the following alleged defects in the Revised Plan:

—narrow definition of 'physically handicapped', which arguably excludes cerebral palsy and prisoners with chronic or degenerative health problems;

—continued practice of carrying wheelchair-using prisoners upstairs for portions of the intake process;

—no required assignment of physically handicapped prisoners to accessible and reasonably safe housing facilities;

—no provision to secure the renovations and modifications at Jester III as recommended by the Meier/Rheinecker Report, including limiting the population to twenty prisoners per dormitory;

—no accessible craft shop at the Jester III Unit;

—failure to evaluate and remedy the temperature in the dining area;

—need flexible shower policy coupled with frequent linen and clothing changes when bowel accidents occur;

—need to establish timetables to renovate the visiting area;

—need full complement of access to work, recreation, education, and other programs and opportunities comparable to non-disabled prisoners;

—no adequate transportation vehicles for mobility impaired inmates;

—no requirement of medical staff including a physiatrist, physical therapist, physical therapist assistant;

—failure to mention female physically disabled prisoners; should TDC receive such an admission, a report to the Special Master should be forthcoming with a comprehensive plan for her accomodations;

—no provision of work and recreational activities for female physically disabled prisoners;

—vague address to the problems of male visually impaired and hearing and speech impaired inmates, regarding appropriate living facilities and a timetable for necessary renovations and modifications;

—need comprehensive listing of the numbers of male and female inmates with each of the handicapping conditions identified, with unit, housing, job and other program assignments designated.

16. The defendants have not responded to the plaintiffs' objections.

## VI.

### ADMINISTRATIVE SEGREGATION

*The Issues*

Plaintiffs charge that TDC has failed to carry into execution many of the obligations imposed on it by the Administrative

---

that the prisoner be hospitalized, because the infection had progressed to his prostate gland and a testicle. After an emergency transfer to the John Sealy Hospital, the prisoner was informed that the removal of the testicle was probable. Although the testicle was permanently damaged, a physician was able to avoid the operation, after the prisoner received the medication that had not been supplied at the Goree Unit. Tr. 1288–1290.

Segregation Plan and the Stipulation and Order Supplementing the Administrative Segregation Plan, which were ordered to be implemented on March 8, 1983, and February 14, 1984, respectively. The plaintiffs note specific shortcomings in relation to housing facilities, lighting, shelves, daily showers, out-of-cell recreation, and case-by-case determinations regarding personal property restrictions.

The plaintiffs submitted the following proposals for relief regarding the alleged violations having to do with conditions in administrative segregation:

—immediate prohibition of assignment of administrative segregation prisoners to solitary confinement;

—by October 1, 1986, the full complement of out-of-cell recreation shall be provided;

—by September 1, 1986, defendants shall provide the required level of cell lighting, with inmates given the option for a lower wattage bulb;

—proper food temperature is to be secured through the use of insulated trays, steam tables, tray carriers and other equipment; within thirty days of the order, defendants shall file a list of all such equipment ordered or purchased, and the units at which it will be used; sanitation procedures shall be observed in serving the administrative segregation population;

—daily showers shall be provided from 7:00 a.m. to 10:00 p.m., and as quickly as possible following the completion of out-of-cell recreation; these hours may be extended to 12:00 a.m. for prisoners designated as "Group A," if such extension is necessary to accomplish daily showers in a safe and secure setting;

—recreation for administrative segregation prisoners may begin at 6:00 a.m., provided that recreation occurs after sunrise and prisoners are provided an opportunity to shower as quickly as possible following their recreation period;

—all indoor and outdoor recreation facilities shall be properly equipped; including a punching bag in the dayroom and one in the recreation yard and a functioning basketball or volleyball for outdoor recreation and televisions in the dayrooms;

—no reduction in the size of any existing administrative segregation recreation yards shall occur;

—by October 1, 1986, TDC is to have completed a one-time review of all administrative segregation inmates to determine whether an alternative custody status is appropriate, such review is to be tendered to plaintiffs' counsel and the Special Master;

—rescind any administrative directive or other policy authorizing blanket property restrictions and adhere to the case-by-case property provisions of the Administrative Segregation Plan;

—administrative segregation inmates shall be supplied with the necessities specified in Section VI of the Crowding Stipulation;

—no prisoner shall be required to pass unclothed through any prisoner living area as a condition of access to recreation, showers, visits, or medical care;

—within thirty days, defendants shall file a certificate signed by the warden of each TDC unit stating that he or she has read and understands this order and has personally inspected all administrative segregation areas of the unit;

—should defendants fail to comply with any of these provisions, they shall be subject to a fine in an amount to be determined by the court.

The defendants counter these claims with two assertions: (1) that the Consent Decree required only that TDC develop a plan to ensure that a prisoner was appropriately assigned to administrative segregation; and (2) that the Amended Decree provided that prisoners in administrative segregation receive at least one hour of physical recreation each day.

### Findings of Fact

1. The Administrative Segregation Plan established that the following conditions shall apply to all administrative segregation inmates:

A. *Housing:* Unit officials shall, from time to time, designate specific cells or cellblocks capable of providing separation from the general population and the required degree of security and control to be used for administrative segregation. Such designated cells shall contain all fixtures described in Section II.A.2.[17] Solitary confinement cells may not be used for administrative segregation except: (a) when there is no space available in administrative segregation cells; and (b) in an extraordinary case in which several inmates must be both separated from the population and prevented from communicating with each other, and only so long as this extraordinary situation exists. If a solitary confinement cell is used to house administrative segregation inmates pursuant to the immediately preceding sentence, that cell shall contain all fixtures described in Section II.A.2, except it need not contain electricity.

B. *Recreation:*

Inmates in any category of administrative segregation for more than seventy-two (72) hours shall be allowed physical recreation out of their cells in conformity with one of the following three schedules:

1. *Schedule:*

a. The inmate shall be permitted out of his cell seven days per week and will be afforded one hour of out-of-cell physical recreation each day. At least two hours of the inmate's weekly out-of-cell recreation shall be outdoors, weather permitting;

b. The inmate shall be permitted out of his cell five days per week and shall be afforded two hours of out-of-cell physical recreation each of the five days. At least two hours of the inmate's weekly out-of-cell recreation shall be outdoors, weather permitting; or

c. The inmate shall be permitted out of his cell four days per week and shall be afforded three hours out-of-cell physical recreation each of the four days. At least three hours of the inmate's weekly out-of-cell recreation shall be outdoors, weather permitting.

The determination of which of the three schedules will be used for each segregation inmate shall be at the discretion of the unit warden, assistant warden or their designate.

2. *Equipment.* Indoor recreation areas shall be equipped with a minimum of one exercise mat and one chinning bar for use by segregation inmates during indoor recreation periods.

3. *Showers.* Inmates in any form of segregation shall be provided the opportunity to take a shower seven days per week. The shower periods shall not be considered to be out-of-cell recreation time.

4. *Denial of Recreation.* Segregation inmates may, on a case by case basis, be denied the opportunity for out-of-cell recreation when fulfillment of the requirement will create an immediate and serious threat to the safety or security of the inmate, other inmates or staff. An inmate shall not be denied recreation when:

a. The immediate and serious threat to safety or security would not exist if the inmate were recreated in available alternative locations (e.g., if the inmate poses an immediate and serious threat to safety or security if recreated on a cellblock run, then an available dayroom or outside recreation area must be used); or

b. The immediate and serious threat to safety or security would not exist if the inmate were recreated individually or in a small group. The decision to deny an inmate recreation shall be in writing and shall explain the reasons for the denial and the reasons why the use of alternative recreation areas or individual or small group recreation will not prevent the immediate and serious threat to the safety or security of the inmate, other inmates or staff.

---

17. Section II.A.2 *Cell Fixtures:* Cells which house administrative segregation inmates shall have all the fixtures of general population housing, including electricity, beds and bedding, adequate lighting, running water, and a toilet.

Copies of the decision shall be placed in the inmate's unit and central files.

C. *Property and Commissary:*

1. *Property:* Administrative segregation inmates shall retain all personal property items allowed to general population inmates with the exception of those items restricted on a case by case basis by the unit classification committee pursuant to Section IV.F. below.[18] The committee may prohibit only those items which present a danger to the security of staff, the inmate, or others or a danger of escape.

2. *Commissary:* Administrative segregation inmates shall have the same access to commissary as general population inmates except as inconsistent with any specific limitation placed on their property by the unit classification committee as provided by Section IV.F., below. Commissary items, however, may be delivered to administrative segregation inmates.

D. *In-Cell Programs:* Administrative segregation inmates may have access to in-cell programs which are consistent with security requirements. These programs may be in the areas of education (e.g., GED courses), hobby crafts and art (e.g., painting and drawing). The warden, assistant warden, or their designate may on a case by case basis suspend an in-cell program(s) when an inmate has abused that privilege.

2. The Stipulation and Order Supplementing the Administrative Segregation Plan detailed additional conditions of administrative segregation confinement.

A. *Lighting:* Defendants shall provide not less than 20 foot candles [19] lighting in all areas of administrative segregation cells where reading is normally accomplished or make available (without cost to indigent inmates) in each administrative segregation cell a lamp such that not less than 20 foot candles of lighting at three feet from the lamp is provided; the lamp may only be denied pursuant to Section II.A.5 of the Administrative Segregation Plan.[20]

B. *Recreation:* All outdoor recreation areas for administrative segregation constructed after this stipulation shall be at least 1,000 square feet in size, and at least 20 feet high, if covered, and shall include facilities and equipment for playing basketball and volleyball. All existing outdoor recreation areas shall have facilities and equipment for playing basketball and volleyball, provided that defendants are not required to enlarge the existing areas except that they shall make reasonable enlargements of the areas at the Retrieve and Beto II units and shall enlarge the Ramsey I area by removing the separation between the two parts of the area.

The times for recreating segregated prisoners shall be staggered so that there are never more prisoners than the facilities and equipment can reasonably accomodate, with all prisoners having a full opportunity to obtain the maximum of large-muscle exercise throughout each recreation period. Recreation periods shall be scheduled for a reasonable time after meals, and shall not be conducted earlier than 8:00 a.m.

C. *Shelves:* All administrative segregation cells shall be equipped with shelves for storing a reasonable amount of personal property.

3. The Stipulation and Order further provided that each warden be informed of the requirement for individualized determinations concerning property restrictions imposed on prisoners in administrative segregation, as follows:

[D]efendants shall issue a directive to each warden stating that prisoners in administrative segregation shall be al-

---

**18.** Section IV.F. *Confinement Procedures:* If the committee determines that the inmate shall be held in segregation, it shall further determine whether any special conditions or restrictions are required for security purposes.

**19.** A footcandle is the illumination of a surface one foot distance from a source of a candlea, equal to one lumen per square foot.

**20.** Section II.A.5 of the Administrative Segregation Plan is the Property and Commissary provision listed above.

lowed to keep all their personal property unless individual items are denied by the unit classification committee on an individual case-by-case basis. Only those items that present a danger to the security of staff, the inmate, or others or a danger of escape may be prohibited. Each denial will be properly documented in accordance with Section II.A.5 of the Administrative Segregation Plan.

4. The administrative segregation population increased from 500 in 1982 to 3,000 in 1986. Tr. 443–44, Defendants' Exhibit No. 5.

5. The Twenty-Eighth Monitor's Report and Administrative Segregation Compliance Reports, administrative checklists, and grievance reports documented several areas of non-compliance regarding the Administrative Segregation Plan and Supplement, specifically, housing facilities, indoor and outdoor recreation, showers, lighting, food, and personal property restrictions. Plaintiffs' Exhibit Nos. 4, 5, 6, 7, 54; Defendants' Exhibit No. 16; Tr. 73.

6. Prisoners were not afforded recreation as scheduled. Contrary to the terms of the stipulation, recreation began as early as 5:00 or 6:00 in the morning. Outdoor recreation yards and indoor dayrooms were not properly equipped. Plaintiffs' Exhibit Nos. 2, 3, 6, 10, 14, 49–52, 67, 68, 70, 71, 77, 78; Defendants' Exhibit Nos. 16, 22, 48, 49, 124; Tr. 450–53, 493–97, 492–95, 1007, 1009, 1155–58, 1179, 1185, 1227, 1313–14, 1326, 1328, 1336, 1353–57, 1362, 1369–71, 1376, 1382.

7. Administrative segregation inmates were not provided showers on a daily basis. Plaintiffs' Exhibit Nos. 6, 7, 14, 15, 50–52, 60, 61, 64, 67, 70–74; Defendants' Exhibit Nos. 16, 22; Tr. 419, 356, 1375.

8. Administrative segregation prisoners were subjected to strip searches both before and after recreation.

It's the standard strip search. The officers come to our cells. They tell us to give them our property, everything that we're going to take with us to the yard. We have to raise our scrotum area, spread our cheeks, our feet, run our fingers though our mouths, our hair, and then we're turned around and get handcuffed.

Tr. 1338. After the strip search, the prisoners were then required to walk, stark naked, down a runway which passed general population prisoners, before reaching the recreation yard. During this interval, they were usually subjected to intensive ridicule and homosexual proposals by the other prisoners. The prisoners so demeaned were required to repeat the entire process, in reverse, at the completion of their recreation periods.[21] Tr. 445–46, 515, 1229, 1338–40.

9. No storage shelves are provided to administrative segregation inmates at the Darrington Unit. In stating a rationale for this deficiency, TDC claims that it prevents inmates from fashioning weapons out of the shelves. Plaintiffs' Exhibit Nos. 6, 67; Defendants' Exhibit No. 16.

10. Most cells are equipped with a 60-watt lightbulb. The administrative segregation cells are painted various colors. Cells painted in light colors register twenty footcandles on the top bunk and sixteen foot candles on the bottom bunk. When a 100-watt bulb was tested, it registered twenty-six footcandles on the top bunk and twenty-two footcandles on the bottom bunk. The painting of cells in light colors and, as well, increased wattage for the lighting of cells have been advocated by various wardens; but lighting deficiencies still exist in administrative segregation facilities. Plaintiffs' Exhibit Nos. 6, 7, 12, 51, 53, 56, 67; Defendants' Exhibit No. 16; Tr. 997, 1167, 1341, 1345–46, 1367–68, 1374.

---

21. On July 23, 1986, TDC issued the following directive regarding administrative segregation procedures, quoted, in part, as follows:

No inmate shall be required, as a condition of access to recreation, showers, visits, or medical care, to pass unclothed, (*i.e.*, without shorts for male inmates or bra and panties for female inmates) through any prisoner living area. Inmates in administrative segregation should be permitted to put on their designated underclothes prior to being escorted to showers, recreation, or other required out-of-cell activities.

11. TDC has adopted blanket property restrictions in the administrative segregation area. This action was purportedly taken for security reasons and to augment staff morale. Generally, metal and glass items were denied to administrative segregation prisoners. Plaintiffs' Exhibit Nos. 13, 67; Defendants' Exhibit No. 22; Tr. 464, 944.

12. During the last three years, 104 reported incidents have occurred in which officers or prisoners were burned by hot liquids. Three allegedly involved the use of immersion heaters. Defendants' Exhibit No. 109. Defendants claim that they do not report the source of the hot liquids in question on a regular basis, and accordingly suggest that the number of incidents involving immersion heaters may exceed three. It was also not reported whether the incidents at issue occurred in administrative segregation. Defendants' Exhibit No. 109, Tr. 77–79, 458, 1191.

13. Both assaultive and non-assaultive prisoners housed in administrative segregation sections are denied immersion heaters. Tr. 1009, 1169, 1348–49. To compensate for the loss, inmates have constructed ingenious heating devices out of extension cords or, alternatively, have contrived and ignited "toilet paper bombs." A "bomb" is composed of tightly rolled toilet paper or newspapers, empty cans, and matches. These expedients have been routinely confiscated, and inmates having possession of them have been disciplined. Plaintiffs' Exhibit No. 13; Tr. 463, 500–02, 1170, 1317, 1360, 1366.

14. Prisoners confined under conditions of "super-segregation" (also called separate or maximum security administrative segregation), are subjected to heightened security restrictions. In this status, they have been isolated, not only from the general population of prisoners, but also from others confined in super-segregation cells. With dismissive indifference to the provisions of the Administrative Segregation Plan, TDC summarily assigned to this restrictive status prisoners reputedly involved in repeated acts of institutional violence, and particularly those suspected of being gang leaders or as being extensively implicated in gang activities. Plaintiffs' Exhibit Nos. 8, 9; Defendants' Exhibits Nos. 128–130; Tr. 503–06.

15. Extraordinary limitations on property and recreation were imposed on prisoners in the super-segregation grouping. By way of example, TDC had ample space to construct an adequate recreation yard for such prisoners at the Coffield Unit; nevertheless, it saw fit to construct for them only a square, fifteen by fifteen foot yard, which contained no exercise equipment. Furthermore, no dayroom or indoor recreation was provided to these prisoners. Other of these stringent limitations included the following: showers were allowed only once every seven days; no outdoor recreation was permitted, unless required by medical personnel, and then only in mechanical restraints; possession of all property was prohibited except for legal materials, writing materials (paper and envelopes), pencils (not to exceed three inches in length), toothbrushes (not to exceed three inches in length), toothpaste, toilet paper (to be issued on a daily basis, not on a roll), linen, and bedding. Additionally, access to the commissary by prisoners in this status was denied, excluding the items listed above; only first class mail was allowed; and visiting privileges were accorded to such prisoners only once per month (on weekdays), and then solely with the approval of the unit warden or assistant warden. These procedures were first implemented on or about April 2, 1985, when the first of six inmates was placed in maximum security administrative segregation. Five additional inmates were assigned to super-segregation a short time later. Plaintiffs' Exhibit No. 8; Tr. 80–81, 506–15, 1024–25, 1029, 1263–69, 1315–19.

16. TDC's compliance office noted that these blanket restrictions were unjustified and, in several instances, punitive. On or about May 16, 1985, most of the restrictions imposed on inmates in maximum security administrative segregation were lifted. Thereafter, inmates were allowed to shower each day; property restrictions were limited to metal, plastic, or other hard objects that could be fashioned into weap-

ons; full mail privileges were reinstated; twice-monthly visiting privileges were restored; and materials were ordered for construction of areas that could be used for daily recreation, unless legitimate security concerns dictated otherwise. TDC has, nonetheless, set aside twelve cells at the Coffield Unit for such separate administrative segregation. Tr. 471.

17. In response to plaintiffs' interrogatories pertaining to conditions in administrative segregation, TDC admitted that eighteen units did not satisfy the various provisions of the Plan and Stipulation. Specific references were made to indoor and outdoor recreation, daily showers, cell lighting, and shelving. Plaintiffs' Exhibit No. 54; Tr. 399. These deficits were additionally documented by TDC's Matrix on Administrative Segregation Compliance. Defendants' Exhibit No. 16.

18. Testimony rendered at the hearing confirmed that each of the above mentioned violations continued through June 1986.

VII.

RECREATION YARDS AND GYMNASIUMS

*The Issues*

The plaintiffs allege that TDC failed to construct all of the recreational facilities ordered in Paragraph II.H. 1 and 2 of the Stipulation and Order entered April 2, 1984. These provisos concerning construction were reaffirmed by Section IV.C.1(a) of the Crowding Stipulation of May 16, 1985, entered July 26, 1985. Additionally, the plaintiffs contend that several of the yards and gymnasiums that were actually constructed are insufficient in size and do not contain the recreational equipment specified in the Crowding Stipulation. Compensatory damages are sought by plaintiffs, for the benefit of all prisoners assigned to units with no recreation facilities or with inadequate facilities. A fine of one dollar per prisoner, for each day that a particular unit is not in compliance, is recommended by plaintiffs, with the fine to be deposited in the Inmate Education and Recreation Fund. Plaintiffs suggest that the projected fines accrue from September 1, 1985, to the date on which defendants certify, and the Special Master reports, that adequate yards and gymnasiums are in operation. Further, the plaintiffs propose that the fines be employed solely to provide for prisoners radios equipped with earphones, additional television sets and movies, arts and crafts supplies for indigent prisoners, and such other benefits for the prisoner class as the court may order.

TDC admits that it did not complete the required construction by either of the deadlines established in the orders referred to previously. Problems with funding, unforeseen difficulties with construction sites at various units, the September 1985, lockdown, and wet weather were tendered by TDC as explanations for the delays in construction. In response to the plaintiffs' allegations regarding specific shortages in square footage and equipment, TDC argues that Section IV.C.1(a) of the Crowding Stipulation already provides a remedy for such supposed deficiencies. TDC urges the court, therefore, to await an expert assessment of these asserted defects before contemplating further relief.

Notwithstanding its foregoing argument, TDC has moved to modify the Crowding Stipulation with respect to the building of a third gymnasium at the Coffield Unit. Stating that a change in the composition of the prisoner population at such unit makes the building of the gymnasium unnecessary, TDC seeks court approval of its decision not to erect this structure.

In insisting that the motion should be denied, plaintiffs refer to a postulated latent ambiguity in the proposal, emphasizing in this regard that TDC may alter the population of the unit in question at any time. Additionally, the plaintiffs dispute the formula used to calculate space at the Coffield Unit (including the comparison made to the Huntsville Unit), because the sufficiency of the recreation space has not yet been determined. The plaintiffs further contend that TDC cannot demonstrate changed circumstances which are sufficient to justify its motion for modification, if

account is taken of the fact that TDC was fully aware of the probable future composition of the population at the Coffield Unit at the time it agreed to the Crowding Stipulation. Alternatively, the plaintiffs urge that the modification should be conditioned on the establishment of a maximum unit capacity level, effective as of November 1, 1986; and they further propose that the funds saved in gymnasium construction be used to furnish restrooms for the recreation yards.

The findings of fact appropriately begin with a recitation of the two relevant provisions.

### Findings of Fact

1. Paragraph II.H. 1 and 2 of the Stipulation and Order Modifying Court's Order of January 11, 1984, filed May 2, 1984, provides that:

H. Defendants shall construct the following facilities on each TDC unit for use as quickly as reasonably possible and no later than September 1, 1985:

1. An outdoor recreation yard or yards of sufficient size and with adequate equipment to serve the capacity of the unit.

2. A gymnasium of sufficient size and with adequate equipment to serve the capacity of the unit.

2. The Crowding Stipulation of May 16, 1985, put into effect by an order dated July 26, 1985, addressed recreational facilities in Section IV.C.1(a), as follows:

IV. Existing Units

C. *Space Requirements*

1. Defendants shall provide the space described below at all existing units.

a. ... As quickly as possible, but not later than November 1, 1985, defendants shall construct the outdoor recreation facilities set forth in Exhibit A, attached [to the Stipulation]. As quickly as possible, but not later than November 1, 1986, defendants shall construct all gymnasiums set forth in Exhibit B, attached [to the Stipulation]. After construction and three months of operation, the adequacy of the size of all facilities constructed for indoor recreation (arena/gymnasium), outdoor recreation or arts and crafts recreation shall be evaluated and established by the experts in accordance with the procedures set forth in Section III.D,[22] and this process shall be completed as quickly as possible and in no event later than January 31, 1987. Any additional space determined by the experts to be necessary shall be constructed as quickly as possible, but in no event later than September 1, 1989. Each outdoor yard shall contain a hard surface basketball court with adequate drainage, a handball wall, facilities for volleyball and appropriate recreational equipment. All gymnasiums shall accommodate and be adequate for basketball, volleyball, weightlifting, pingpong and handball, and shall contain toilets and lavatories.

3. Section I of the Crowding Stipulation established that:

All prior orders of the court in this cause shall remain in full force and effect.... In particular, and notwithstanding the provisions of Section IV.C.1.(a), *infra*, Sections II. H.1 and 2 of the Stipulation and Order Modifying Court's Order of January 11, 1984, entered by the court on April 2, 1984, shall remain in full force and effect and may be the subject of

---

**22.** Section III.D. provides that defendants' expert, with the assistance of an expert selected by the plaintiffs, shall develop space standards and configurations for a prototype unit. These configurations were to be based on the assumption of a mixed prisoner population, including general population prisoners with various custody classifications, and, as well, prisoners in administrative segregation were to be assigned to single-occupancy cells. The space standards were to be guided by the specifications contained in the report prepared by Henningson, Durham & Richardson, Inc., submitted to TDC on February 18, 1985, as adapted to achieve the mission of the prototype unit.

It is also provided that, if the parties' experts fail to reach an agreement on the amount or configuration of space required for outdoor recreation or gymnasiums, the two experts shall select a third expert to make a final determination of any disputed space or configuration requirement. This process is governed by the provisions of 9 U.S.C. § 2, *et seq.*

enforcement proceedings apart from this Stipulation.

4. In its emergency budget proposal for the 1984–85 biennium, dated May 14, 1985, TDC noted that it was required to construct seventy-six recreation yards, in order to provide minimal recreation areas at all units. TDC sought $1.9 million as the cost for this construction project. It is highly conspicuous in this regard that no funds for gymnasium construction were requested by TDC in the proposal. It is also singularly noteworthy that the Legislature appropriated the full amount requested in the emergency budget proposal. Plaintiffs' Exhibit No. 57; Tr. 81.

5. The funds appropriated by the Legislature were insufficient to build the recreational yards specified in the Crowding Stipulation. Instead, for the prisoners' recreational use, TDC provided only concrete slabs for weightlifting, which are enclosed by fences. Plaintiffs' Exhibit No. 58; Tr. 393, 411.

6. In addition to the insufficient funding, TDC also cited the general lockdown of the prisoners in September 1985, site difficulties, and wet weather as the reasons that prevented the prisoner work crews from building recreation yards, as previously noted. It is significant in this relation that no alternative recreation or additional dayrooms were provided the prisoners. Tr. 84–85, 393, 775–76.

7. When asked to identify all units, as of September 1, 1985, that did not have in full operation outdoor yards and gymnasiums, of sufficient size and adequately equipped to serve the needs of the prisoner population at the unit, TDC listed the following:

A. *Outdoor Yards:* Beto I, Beto II, Central, Clemens, Coffield, Darrington, Diagnostic, Ellis I, Ellis II, Ferguson, Gatesville, Goree, Hilltop, Jester I, Jester II, Jester III, Mountain View, Pack I, Pack II, Ramsey I, Ramsey III, Retrieve, Wynne.

B. *Gymnasiums:* Beto I, Central, Coffield, Darrington, Diagnostic, Eastham, Ferguson, Gatesville, Hilltop, Jester I, Jester II, Ramsey I, Wynne.

Plaintiffs' Exhibit No. 54.

8. By September 1, 1985, some twenty-four units were without recreation yards, and thirteen units had no gymnasium. TDC disputes that September 1, 1985, was the deadline for these construction projects.

9. Likewise, TDC failed to meet the November 1, 1985, deadline of the Crowding Stipulation for construction of recreation yards. In responding to TDC's allegations regarding delays occasioned by wet weather, plaintiffs accurately observed that "though the Fall of 1985 may have been uncommonly wet, the summer of 1985 was an unusually dry one, ideal for building." Plaintiffs' Reply Brief at 20; Defendants' Exhibit No. 113. The recreation yards were completed by February 1, 1986. TDC predicts that gymnasium construction will be completed by November 1986.

10. The recreation yards ultimately constructed in February 1986, do not meet the required specifications. The $1.9 million TDC requested and received was insufficient to fund construction of the square footage requirements; to provide hard surfaces for basketball courts, handball walls, and volleyball; or to furnish equipment for these games. Plaintiffs' Exhibit No. 58; Tr. 396, 1134, 1137, 1142.

## CONCLUSIONS OF LAW

1. The plaintiffs have documented in clear detail violations of the court orders in each of the seven areas in controversy. It must be determined, then, whether such violations are so significant in scope as to constitute civil contempt. In numerous cases, TDC unquestionably has not reached compliance with particular orders—some dated as early as 1981—and it obviously will not be in conformity with the requirements of such orders in the immediate future. It is also glaringly apparent that TDC made no efforts whatsoever to comply with the orders in question for long periods of time, and that in other instances attempts to observe them were extremely tentative. In sum, it is unmistakable that,

on the whole, TDC has been habitually and inexcusably dilatory in fulfilling its obligations in respect to the relevant orders.

■■■ 2. It is found that the plaintiffs have proved civil contempt on the part of TDC, by clear and convincing evidence, in the area of single-celling. Paragraph II.F. of the Stipulation Modifying the Court's Order of January 11, 1984, and Paragraph II.I.1 of the Crowding Stipulation required TDC "forthwith" to single-cell inmates who required such housing. Court orders are to be obeyed and cannot be ignored unless withdrawn or vacated. *W.R. Grace Co. v. Local Union 759*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298, 307 (1983). Because TDC procrastinated in obeying a court order requiring immediate action, a finding of contempt in this regard is compelled.

3. TDC has given a notable and melancholy example of what can be done under the threat of contempt sanctions. A flurry of activity followed the filing of plaintiffs' contempt motion; nonetheless, despite this belated animation on its part, TDC's concrete achievements relative to single-cell placements were negligible in 1985. It is beyond this court's scope of inquiry, of course, whether this lack of commitment was motivated by ineptitude or obstructionism, for intent plays no part in the determination of contempt.

4. This court's order in 1984 incontestably required TDC immediately to assign prisoners to single-occupancy housing who were identified as requiring it. An entire year passed without action. As a concession to plaintiffs, in return for their agreement to postpone a hearing regarding other instances of noncompliance by it, TDC entered into the Crowding Stipulation. Again, a significant lapse of time occurred before TDC provided any of the prescribed single-celling. The initial steps of formulating a computer program, and the subsequent alteration of the housing scheme to permit improper placement of inmates designated for single-celling, further indicate a lack of diligence on the part of the prison officials; these procedures evince all too well TDC's preoccupation with identification of prisoners eligible for single-celling *vis-à-vis* the tangible placement of prisoners in such housing.

5. At the hearing, TDC was able to demonstrate substantial compliance in June 1986, some two years after the court's mandate to single-cell eligible prisoners immediately. TDC presented evidence in this regard that it had single-celled the vast majority of the prisoners requiring such housing; [23] but its efforts to achieve this goal have been far from assiduous.[24] Absent due diligence, TDC's conformance by that date is inconsequential respecting the determination of whether it is guilty of contempt. The length of time TDC required to achieve its current situation, as well as its placement of assaultive and vulnerable inmates in administrative segregation, amply support a finding of contempt.

6. TDC declares that the absence of a specific provision in the Crowding Stipulation prohibiting the single-celling of assaultive and vulnerable prisoners in administrative segregation cells immunizes it from condign penalties for any alleged violations. Yet, a party's compliance with a court order cannot be avoided by a "literal or hypertechnical reading of an order.... It is the spirit and purpose of [the order], not merely its precise words, that must be obeyed." *National Research Bureau, Inc. v. Kucker*, 481 F.Supp. 612, 615 (S.D.N.Y. 1979) (citation omitted).

**23.** On June 24, 1986, TDC announced that a mere seven inmates who had been identified as requiring single-occupancy housing were improperly housed, which is a significant decrease from the 1985 figures, *i.e.*, 635 in October and 542 in December.

**24.** No representation is made regarding the adequacy of the identification process in the first instance, a matter not the subject of this motion. It is noted, however, that as TDC admissions have continually risen over the past several months, the percentage of inmates identified as requiring single-occupancy cells has steadily declined. By court order dated May 27, 1986, the Special Master was directed to assess the adequacy of the identification process. The Thirty-Third Monitor's Report recommended the employment of an expert in this regard. Neither party objected to the recommendation. The matter is currently under advisement.

7. TDC's policy of placing all vulnerable and assaultive prisoners who were designated for single-cells in administrative segregation facilities was grievously inconsistent with the purpose of the order, as was also its continual allocation of such female prisoners to dormitory housing.

## CLASSIFICATION

■■ 8. The plaintiffs have demonstrated by clear and convincing evidence TDC's tardy response to the improper housing of prisoners, and its unsteadfast efforts to eliminate the clearly evident defects respecting prisoners' housing. Because TDC took well over a year to reach its current level of mixing, an absence of adequate diligence has been plainly manifested. Specifically, the presence of 400 mixed custody classifications at TDC, coupled with its failure to address the female housing problem, sufficiently proves a failure to achieve substantial compliance with the relevant orders. Hence, a finding of contempt is warranted.

9. TDC presents four arguments to negate this finding. First, TDC maintains that there is no court order which sets out "in specific detail an unequivocal command" that the "Custody Assignment Procedures" of the Classification Plan prohibit the subdivision of cellblocks or tiers for the purpose of housing prisoners in different custody classifications. Defendants' Post-Hearing Brief at 25. This cavil with the precisely drawn language of the court order, which directs that prisoners in differing custody classifications not be housed together, contributes nothing toward a demonstration of either substantial compliance or due diligence.

10. TDC's distinction between intra-cell and inter-cell abuse of prisoners is also unpersuasive. Prisoners in the same cellblock dine, have recreation, and shower together. The order was directed toward preventing all forms of inmate-on-inmate abuse, irrespective of the exact location of the mistreatment. When prisoners in variant custody classifications are housed together, albeit on separate tiers, the purpose of the order is inevitably and effectually defeated. Had TDC demonstrated any attempt to maintain the separation of prisoners with regard to their particular custody classifications, an alternative finding may have occurred. Instead, because TDC's housing assignments encourage contact between prisoners in divergent classifications, the pertinent orders of the court designed to negate these practices indisputably have been violated.

11. TDC acknowledges that the "better practice is to assign only one custody category per cellblock" and that "such assignments have been and remain TDC's goal." Defendant's Post-Hearing Brief at 25. It is curiously paradoxical, however, that this acknowledgment conforms exactly to what the court order directs. Therefore, it is found that TDC's first argument in bar of a finding of contempt is not meritorious.

12. Secondly, TDC postulates that, even assuming it is prohibited from mixing different custody categories in the same cellblock, there is an absence of specific detail or unequivocal command as to when mixing must be stopped or, more accurately, when "unmixing" must be completed. Further, TDC advances the proposition that, if plaintiffs concede that prison officials are given at least two days to implement the court's orders, then two months or two years would be equally plausible. Defendants' Post-Hearing Brief at 26. But, contrary to TDC's fallacious assumption, the question of timing is not an open one.

■■■■ 13. TDC's arguments are plainly implausible, inasmuch as time limits on compliance are governed by a standard of reasonableness. Given diligent efforts by TDC to adhere to the order, two days or two months may appear to have been reasonable, but two years does not. The orders directed immediate implementation; they manifestly did not sanction a two-year incubation period before efforts to comply were set in motion. Because TDC has not been diligent in meeting the court's directive, a finding of contempt is necessary.

14. Substantial compliance is a relative concept, dependent upon the particular circumstances. The issue of whether 400 mixed custody classifications generates

substantial compliance does not merit discussion, because TDC initially failed promptly to address any impediments to its conformance with the order. While TDC argues that it has done all that it can do to observe the order, and that the current level of mixing must necessarily continue, the testimony of expert witnesses credibly challenged this prediction as unfounded and self-serving.

15. It was not the purpose of the Classification Plan, in particular, to house women prisoners in dormitories indefinitely. TDC's third argument posits that, in the absence of a closing date prescribing when medium and close custody women prisoners must be removed from the dormitories, a finding of contempt is unfounded. This argument fails, insomuch as it would absolve TDC from ever observing the court's directive that no mixing occur. It was clearly unreasonable for TDC to have failed to construct the necessary cells, and to have neglected to move female prisoners to alternative facilities; and its obstinate and obdurate disobedience of the pertinent court orders will not be accepted.

16. As a last argument, TDC insists that the Crowding Stipulation provides a 1987 and 1989 timetable "to achieve compliance with defendants' Classification Plan." The Plan does not speak to a date for unmixing; on the contrary, it refers to the date that depopulation must occur before achievement of the goals of the Classification Plan are met. Accordingly, because it is apparent that depopulation is not the sole mechanism by which TDC can meet the classification requirements, the years 1987 and 1989 may not serve as substituted deadlines for the court orders, particularly, since they were specifically designed to compel TDC immediately to address its deficiencies regarding compliance. The determination of TDC's civil contempt in the classification area thus stands.

## STAFF DEPLOYMENT

17. In the Stipulated Modification, TDC was expressly required to maintain a specified number of personnel, and to deploy staff, in the housing areas. Order, October 12, 1982, pp. 1–2; *Ruiz v. McKaskle*, 724 F.2d at 1151. The Stipulated Modification additionally established a three-year plan to accomplish the requirements set forth in the Staffing Study. Under the plan, all TDC units were to have employed and appropriately positioned the necessary staff no later than January 1, 1985. TDC has conspicuously failed to fulfill the precepts of the Stipulated Modification; consequently, it must be found to be in contempt in this regard.

18. The institution review of January 3, 1985, and also the review performed in June 1986, verify noncompliance with the staffing requirements. In both reviews, it was determined that several units did not post correctional officers in the housing areas, which had the malefic effect of jeopardizing the security of the inmates and the institution. The principal obstacle to compliance appears to have been TDC's shortage of personnel.[25]

19. Throughout the hearing, however, TDC alleged that the failure to deploy staff in the housing areas was attributable to the mismanagement of existing staff. TDC witnesses expressed confidence that, by relocating numerous clerical positions to housing areas, the difficulties could be surmounted. They denied that this amounted to "robbing Peter to pay Paul."

20. A court may not unjustifiably condone any type of contumacious behavior. Major flaws exist in the "Peter/Paul" methodology proposed by TDC. First, TDC does not yet have a sufficient staff to satisfy the relevant court order. Even with a more efficient use of existing clerical personnel and the subsequent reorganization of its staff, TDC is still far short of

**25.** Erroneous deployment practices may constitute an additional staffing problem. The Office of the Special Master noted that officers at fourteen of the twenty-seven units were posted throughout the hallways and corridors in substantially greater numbers than those recommended by the Staffing Study. The witnesses Park and Wright both referred to the cluster of officers they typically found around the entryways to housing areas, and also noted the absence of patrolling by correctional officers in the living quarters.

the staffing needs cited in the staffing study and its subsequent updates.

21. Further, TDC is not scheduled to receive additional officers until September 1, 1987. Those correctional officers undoubtedly will require training prior to assignment to the housing areas, which will cause yet another delay in meeting the 1982 staffing mandate.

## MEDICAL STAFF

22. TDC has failed to employ a substantial number of health care professionals, and it has not otherwise been diligent in comporting to the Comprehensive Health Care Plan. Its record regarding the hiring and retention of health care professionals can only be characterized as abysmal. Vacancies range from ten to 100 percent. TDC only recently raised the salaries of a portion of the health care positions in question; and it was not until July 1986, that TDC hired a medical recruiter.

23. Like the concept of reasonableness, substantiality of compliance in relation to a consent decree must depend on the circumstances of each case, including the nature of the interests at stake and the degree to which noncompliance affects them. *Fortin v. Commissioner of Massachusetts Department of Public Welfare*, 692 F.2d 790, 795 (1st Cir.1982). In this instance, the physical and mental health of the entire Texas prison population is in jeopardy. The degree of noncompliance has been demonstrably extreme, the exiguity of psychiatrists and physical therapists being merely examples in point. Giving consideration to the evidence adduced with reference to the unique care required for intellectually impaired inmates, inmates with psychological problems, and the physically impaired, it is obvious that the employment of an appropriate number of professional staff is critical. Since TDC has secured only two out of the thirty-two full-time psychiatrists required, and none of the

eight physical therapists which were mandated, a finding of contempt is obligatory.[26]

24. Court-appointed experts noted as early as 1983 that TDC salaries were not competitive; notwithstanding this observation, TDC has currently asserted that it merely needs additional time to fill the newly reclassified positions, which, it alleges, have sufficiently high salaries to attract the needed personnel. It is unreasonable to expect that necessary medical treatment be held in abeyance until the next legislative session meets in January 1987, with the hope of additional funding at that time. Such funds would not likely become available until nine months after approval, under TDC's current budgetary cycle. TDC requests that the court await the outcome of the Seventieth Regular Legislative Session before considering further relief; but, it is palpable that such a "wait and see" approach is wholly inappropriate in the area of essential medical care for prisoners.

## PHYSICALLY HANDICAPPED PRISONERS

25. Contrary to TDC's position in this regard, the Consent Decree explicitly required, among other things, that physically handicapped prisoners be granted "access to work, recreation, education, or other programs or opportunities," unless they were specifically and individually exempted from the provisions of the decree by the determinations of licensed physicians. Consent Decree, Section II.C. Additionally, TDC was obligated to provide adequate medical care and housing for these prisoners.

26. The plaintiffs have proved by clear and convincing evidence that TDC failed to meet the needs of the physically handicapped. The evidence thoroughly established in this relation that access to various prison programs by physically handicapped prisoners is sporadic, and that it is often denied to them by reason of structural barriers.

---

**26.** Such a poor record rises to the level of deliberate indifference to serious medical needs of prisoners. It is acknowledged that TDC has hired some phychiatrists on a contractual basis, raising the number of full-time equivalents to 10.9. However, the three applications still under review are not considered here.

27. As set forth in the section pertaining to its medical staff, TDC has not employed the requisite number of health care personnel. The absence of knowledgeable medical personnel, including physiatrists, physical therapists, and physical therapist assistants, renders appropriate diagnosis and treatment of physically handicapped prisoners virtually impossible. The testimony of various witnesses illustrates this point all too clearly. Numerous and deplorable inadequacies were noted in past and current housing facilities for physically handicapped prisoners, including, but not limited to, unsuitable or ineffective toilets, showers, and room temperature, along with grossly unbefitting obstacles to such prisoners' access to these facilities and others.

28. The repetition of these violations indicate a lack of diligence. Five years after a court decree requiring that basic needs be furnished to this special class of prisoners, TDC continues to do little more than proffer velleities, in the form of lamentably defective plans. Accordingly, a judgment of contempt in this regard is appropriate.

## ADMINISTRATIVE SEGREGATION

■ 29. The Administrative Segregation Plan and its Supplement required appropriate housing, lighting, shelves, daily showers, out-of-cell recreation, equipment, and case-by-case determinations of property restrictions for prisoners in an administrative segregation status. TDC admits that it has not substantially complied with these court orders.

30. TDC cites the September 1985, lockdown as the reason for its non-compliance with the decree's provisions respecting conditions in administrative segregation. TDC in this regard argues that it should not be held in contempt for the above-listed violations, inasmuch as the population increases in administrative segregation have been significant, citing *Thompson v. Enomoto*, 542 F.Supp. 768 (N.D.Cal.1982). There, it was held that the defendants had been reasonably diligent in attempting to accomplish what was agreed to in the provisions of the consent decree, and that, since noncompliance was largely attributable to increases in the population, a finding of contempt would not be made. The district court relied on *Nelson v. Collins*, 659 F.2d 420 (4th Cir.1981), for the proposition that prison authorities cannot be held in contempt for failure to comply with court decrees, where an unanticipated increase in prison population made it plain that court orders were not reasonably achievable.

31. It is significant to note, however, that the population increase referred to in *Nelson v. Collins* related to death row inmates, and that the prison officials had no control over the fluctuations in their number. Here, the number of administrative segregation prisoners increased as the direct result of measures adopted by TDC,[27] and not because of such factors as the actions of juries or of sentencing courts.

32. TDC was not in compliance with the pertinent orders prior to the lockdown, nor has it been subsequently. Plaintiffs' Exhibit Nos. 60, 61, 71, 72, 73; Tr. 73. Therefore, a finding of civil contempt is warranted, for the reason that TDC has not been assiduous in complying with the orders of the court and, moreover, admits its noncompliance therewith.

## RECREATION YARDS AND GYMNASIUMS

■ 33. TDC did not comform to the orders of the court to build and properly equip recreation yards and gymnasiums.

34. In making reference to Section I of the Crowding Stipulation, TDC suggests that plaintiffs rolled "a Trojan horse through the gates of the prison." Defendants' Post-Hearing Brief, p. 76. If this were true, it would represent the sole example, mythical or otherwise, of a significant achievement respecting recreation in the Texas prison system in 1985. In essence, Section I permits plaintiffs to challenge TDC's construction deficiencies un-

---

**27.** In response to the disturbances in September 1985, TDC assigned certain groups of prisoners to administrative segregation, *en masse,* as a means to crush ongoing violence between prisoner gangs.

der Section II.H. 1 and 2 of the Stipulation and Order. The Crowding Stipulation established a November 1, 1985, construction deadline for recreation yards, and also set November 1, 1986, as the time limit for construction of gymnasiums; nevertheless, September 1, 1985, remained the effective enforcement date for both construction projects.

35. The language of the Stipulation, agreed to by TDC, bears repeating:

Sections II.H. 1 and 2 of the Stipulation and Order Modifying Court's Order of January 11, 1984, entered by the court on April 2, 1984, *shall remain in full force and effect and may be the subject of enforcement proceedings apart from this Stipulation.*

(Emphasis added.) TDC's attempt to establish November 1, 1985, and 1986 as the requisite deadlines is nonsensical, given the unambiguous language of Section I of the Crowding Stipulation. Contrary to the requirements of both court orders, TDC did not complete the construction for recreational purposes until February 1986.

36. TDC proposed a stingily bare facility as the basis for its budget request, disingenuously presuming that it would fulfill the spirit of the Stipulation and Order of May 2, 1984, and also the specifications contained in the Crowding Stipulation. But by no stretch of the imagination did the construction of cement slabs, surrounded by fences, comprise adequate recreation facilities. An expert assessment as to that fact is unnecessary.

37. TDC's specious assertion that it had no notice of the specification until it entered the Crowding Stipulation cannot be entertained. The Crowding Stipulation was signed by the parties on May 10, 1985; TDC presented its budget request four days later. Thus, TDC's emergency budget proposal was made with full knowledge of the specifications required suitably to construct the necessary recreation facilities. Despite this knowledge, a manifestly insufficient request for the funding of the required construction was submitted by TDC.

38. It is completely evident that, even now, many of the facilities do not have the needed square footage or the equipment specified in the Crowding Stipulation. TDC asserts that it has built over 2,500,000 square feet of yards, all the while admitting that its goal for recreation was construction of a concrete slab for weightlifting equipment, together with a surrounding fence. Gymnasium construction was also delayed, because of TDC's failure to request necessary funding. By reason of the fact that TDC has not substantially complied with, nor been reasonably assiduous in seeking to follow these construction requirements, it must be held in contempt.

39. In brief, TDC has failed to conform to virtually every provision of the orders under consideration in significant respects. Before addressing the appropriate relief for the numerous violations which have been found, the defendants' motions to modify will be considered.

## DEFENDANTS' MOTIONS TO MODIFY

40. TDC seeks modification of the court orders in four areas, specifically, female housing, staff deployment, administrative segregation, and recreation. Because each modification would alleviate or eliminate conditions or restrictions imposed by the prior court order, the *Swift* test serves as the basis for review of these proposals. *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The Fifth Circuit's treatment of motions to modify pursuant to Fed.R.Civ.P. 60(b)(6) [28] is consistent with the *Swift* stan-

---

**28.** Rule 60(b) permits a court to relieve a party from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether hereto-fore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6)

dard, which requires a "clear showing of grievous wrong evoked by new and unforeseen conditions".

41. Only where there are "extraordinary circumstances" present is a modification under Rule 60(b)(6) available. *Shaffer v. Williams,* 794 F.2d 1030, 1033 (5th Cir.1986); *Hibernia National Bank v. Administracion Central Sociedad Anonima,* 776 F.2d 1277, 1281 (5th Cir.1985). *See also Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Center,* 765 F.2d 1278, 1292 (5th Cir.1985) (Rule 60(b)(6) "appropriately invoked only in 'exceptional and compelling circumstances.' 7 J. Moore & J. Lucas, Moore's Federal Practice ¶ 60.27[1], at 60–269 (2d ed. 1985)"), *modified on other grounds,* 777 F.2d 329 (5th Cir.1985). Each modification request will be examined with regard to these standards.

42. TDC seeks modification of the Classification Plan, placing reliance on its interpretation of the testimony of Gwynne Washington, an expert in the field of female corrections. TDC suggests in this connection that women have historically been overclassified, because they allegedly are significantly less violent than men. Accordingly, TDC contends that dormitories provide adequate, secure housing for women in medium and close custody classifications. Under its proposal, TDC would be permitted to continue to house women prisoners in these custody statuses in dormitories.

43. The contention that "new and unforeseen circumstances" necessitate modifications represents a change in TDC philosophy regarding female prisoners. Ninety-six women prisoners in a close custody status were moved to cell housing at the time of the completion of cell construction. Somewhat contradictorily, TDC did not argue that these prisoners should be permitted to reside in dormitories. Instead, the motion for modification requests permission for TDC to house in dormitories the remaining women in a close custody status and all medium custody females.

44. This latter action, coupled with the conflicting nature of the testimony regarding the appropriateness of dormitory housing for women requiring medium or close custody, makes particularly questionable the defendants' contentions pertaining to the modification of the Classification Plan. As TDC repeatedly noted, a subjective component of the classification process, already in effect, permits adjustments of the otherwise rigid custody classifications respecting individual prisoners. Since the Classification Plan will allow the alternate classification of women, if appropriate, it follows that TDC's change in philosophy does not demonstrate a sufficient reason for modification.

45. TDC has moved for an extension of time to post officers in the living areas. In the manner provided in Section XIIIB of the Stipulated Modification,[29] TDC requests a delay until November 1986, to post officers in cellblocks, and until November 1987, to station officers in dormitories, as prescribed by the 1982 NIC/TDC Staffing Study. TDC argues, as already related, that the extensions are justified by the complexity of the transition from prisoner to staff control, and professes belief that it can meet these deadlines.

46. The complexity of the situation at hand was incontestably exacerbated by TDC's repeated denial of the existence of the building tender system. This self-induced delay in dismantling a prisoner-run system cannot now justify modification of the compliance date. More than four years have passed, and TDC remains sorely deficient in providing secure living areas for

---

any other reason justifying relief from the operation of the judgment.
TDC alleged none of the factors necessary for modification based on the first five reasons cited in the rule. Accordingly, evaluation of its motion based on the provisions of 60(b)(6) appears proper.

**29.** Section XIIIB states that should any of the quarterly compliance reports reflect that "full compliance cannot be achieved in accordance with the timetable established in Section XIIIA. of this Stipulation, the defendants may apply to the court, pursuant to the *Federal Rules of Civil Procedure,* for an extension of time in which to achieve full compliance."

the vast majority of its prisoners. Further delay in this regard cannot be sanctioned, as TDC has presented no compelling exigency which was generated by new and unforeseen circumstances associated with the staffing mandate.

47. TDC moves, pursuant to Fed. R.Civ.P. 60, to modify paragraph three of the Stipulation and Order Supplementing the Administrative Segregation Plan, so as to permit the commencement of recreation at 6:00 a.m.

48. TDC offered the following as justification for the modification request:

Providing recreation to an unruly population such as administrative segregation is difficult under the best of circumstances. The prohibition in paragraph 3 of the *Stipulation and Order Supplementing Administrative Segregation Plan,* which keeps defendants from beginning recreation earlier than 8:00 a.m., makes providing recreation extremely difficult. Therefore, pursuant to Federal Rule of Civil Procedure 60, defendants move to modify this order so that they can begin recreation at 6:00 a.m. Starting at 6:00 a.m. provides an extra fourteen hours a week to recreate the population. These additional hours will help ensure that the recreation plan is met.

49. Absent from this presentation is an "exceptional or extraordinary circumstance" to support modification. TDC abruptly altered the recreation schedule at several units without court approval. These recreation schedules, some beginning as early as 5:00 a.m., did not result in compliance with the daily recreation requirements. The motion shall be denied.

50. Defendants suggest the following modification of property restrictions in administrative segregation:

Administrative segregation inmates shall retain all personal property items allowed to general population inmates with the exception of those items restricted on a case by case basis by the unit classification committee pursuant to Section IV.F., below, *or those items restricted to a complete category of inmates in seg-*

*regation as approved by the Director.* The committee *or Director* may prohibit only those items which present a danger to the security of staff, the inmate, or others or a danger of escape. (Emphasis added.)

51. TDC admits that it has already adopted this policy, without court approval, as an alleged emergency measure critical to the security and morale of the staff. Although admitting that the better practice would have been an initial presentation to the court of a motion for modification, TDC, nevertheless, presently seeks retroactive approval of its action. The current court-ordered procedures permit TDC to restrict prisoner's access to various property items, upon a determination that such action is warranted in a particular set of circumstances.

52. To justify its blanket prohibition of various glass and metal objects, TDC submitted proof of isolated breaches of security in administrative segregation facilities, and also argued that the proscription elevated staff morale. The existing orders sufficiently address problems concerning abuses of property by prisoners. The case-by-case method appears especially relevant, however, when consideration is given to the fact that prisoners of widely varying dispositions and characteristics are relegated to administrative segregation cells. Moreover, TDC staff approval or disapproval of this provision is irrelevant.

53. TDC has demonstrated no changed circumstances compelling Rule 60(b)(6) modification regarding the property restriction procedure.

54. Additionally, TDC seeks modification of Section 4 of the Supplemental Stipulation, by permitting the second bunk in administrative segregation cells to serve as the shelf required by that section. TDC advances two justifications for this request: 1) the shelves are a minor provision not linked to a constitutional right; and 2) at the time TDC negotiated the Supplemental Stipulation, it had not yet agreed to single-cell all administrative segregation inmates. Neither justification shows "changed circumstances" of such signifi-

cant magnitude as to require modification of the Supplemental Stipulation.

■ 55. The absence of a constitutional basis for a shelf requirement does not negate the provision. Similarly, the subsequent agreement to single-cell all administrative segregation prisoners by September 1, 1989, does not relieve TDC of the immediate requirement for shelving.

■ 56. To the extent that this modification request is consistent with the Supplemental Stipulation, it shall be approved. TDC has discretion to construct the shelves from whatever material it deems appropriate, including the second bunk in the administrative segregation cells. It is noted, with emphasis, that TDC is not relieved of its obligation immediately to provide shelves to prisoners in administrative segregation facilities.

■ 57. TDC also seeks modification of the Crowding Stipulation, suggesting that a change in unit mission at the Coffield Unit should nullify the need for a third gymnasium at this time. Apparently, TDC contemplates that as many as 900 of Coffield's 3,000 prisoner capacity will be in administrative segregation by September 1987, and that such prisoners will not have access to a gymnasium for the general population.

58. The current space available, and the lapse of a year in securing the anticipated population mix, render this proposal unwise. However, the costs involved in constructing a gymnasium must be considered, since TDC argues that it will be obsolete within a year.

59. If TDC resubmits its request for modification, documenting an actual, as opposed to a projected, change in population composition, such a request shall be entertained. TDC is reminded that the construction deadline for the gymnasium in question was September 1, 1985. If a resubmission is to be considered, a motion requesting it must be filed, forthwith. Otherwise, the penalties associated with continual violations of the relevant stipulations will come into effect.

## RELIEF

■ 60. "Sanctions in civil contempt proceedings may be employed 'for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.'" *Local 28 of Sheet Metal Workers' International Association v. Equal Employment Opportunity Commission,* — U.S. —, 106 S.Ct. 3019, 3033, 92 L.Ed.2d 344 (1986) (citations omitted). "[The court] must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). In this regard, monetary relief may be awarded.

In exercising their prospective powers under *Ex parte Young* [209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ] and *Edelman v. Jordan,* [415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)], federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced. Many of the court's most effective enforcement weapons involve financial penalties. A criminal contempt prosecution for "resistance to [the court's] lawful ... order" may result in a jail term or a fine. 18 U.S.C. § 401 (1976 ed.). Civil contempt proceedings may yield a conditional jail term or fine. *United States v. Mine Workers,* 330 U.S. 258, 305 [67 S.Ct. 677, 702, 91 L.Ed. 884]. Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance. *Id.,* at 304 [67 S.Ct. at 701]; *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418 [31 S.Ct. 492, 55 L.Ed. 797 (1911)].

*Hutto v. Finney,* 437 U.S. 678, 690–91, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978).

61. TDC objects to any compensatory awards, maintaining that such relief violates the eleventh amendment. Eleventh amendment doctrine prohibits retroactive

monetary awards to plaintiffs in civil actions, even where such relief can be categorized as equitable restitution. Yet, prospective injunctive relief against state officials is permissible, although the state treasury is significantly affected. The Supreme Court's position regarding the issue of relief could not be more evident:

> If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance. The principles of federalism that inform Eleventh Amendment doctrine surely do not require federal courts to enforce their decrees only by sending high state officials to jail. [Footnote omitted.] The less intrusive power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief.

*Hutto v. Finney*, 437 U.S. at 691, 98 S.Ct. at 2573. *See Norman Bridge Drug Company v. Banner*, 529 F.2d 822, 827 (5th Cir.1976).

An appropriate order shall be issued contemporaneously herewith, which shall prescribe the means by which TDC may purge itself of the contempts alluded to and described in this memorandum opinion. If necessary, a separate order shall be issued subsequently, which shall provide for the disposition of any funds derived from fines which may have been collected from TDC.